**STATE OF MISSISSIPPI, Plaintiff,**

v.

**UNITED STATES of America, and Griffin B. Bell, Attorney General of the United States, Individually and in his official capacity, Defendants.**

Civ. A. No. 78–1425.

United States District Court, District of Columbia.

June 1, 1979.

Jerris Leonard, Washington, D. C., for State of Mississippi, plaintiff.

Jeremy I. Schwartz, Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., for United States of America and Griffin B. Bell, Attorney General of the United States, individually and in his official capacity, defendants.

Frank R. Parker, Jackson, Miss., Richard S. Kohn, Washington, D. C., for Aaron E. Henry, Henry J. Kirksey, Mrs. Mary Hightower, Johnnie E. Walls, Jr., Charles Victor McTeer, Fred L. Banks, Jr., David Jordan, James G. Winfield, Bennie G. Thompson and Barney Schoby, defendants-intervenors.

Before WILKEY, Circuit Judge, and PRATT and GREENE, District Judges.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action was heard upon plaintiff's request for declaratory relief pursuant to section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. It concerns the validity of the Mississippi Legislature's statutory legislative reapportionment plan, Miss. Laws, 1978, Chs. 515 and 535, H.B. 1491 and S.B. 3098, enacted in March, 1978. The hearing took place September 18–27, 1978, at which a record of more than 1500 pages of oral testimony was compiled and more than 80 exhibits received in evidence. The matter has been extensively briefed by all parties. Based on this record of the evidence presented and on the applicable law, we make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

I. *Factual and Procedural Background:*

1. In 1965, private plaintiffs filed a complaint entitled *Connor v. Johnson* in the Southern District of Mississippi (hereinafter referred to as "the *Connor* Court") challenging the constitutionality of Mississippi's 1962 legislative reapportionment plan for the Mississippi Legislature. The 1962 plan, as well as successive legislative attempts to redistrict Mississippi's legislature for the 1967 and 1971 elections, were held unconstitutional by the District Court. *Connor v. Johnson*, 330 F.Supp. 506 (S.D.Miss.), *supplemented in* 330 F.Supp. 521 (S.D.Miss. 1971); *Connor v. Johnson*, 265 F.Supp. 492 (S.D.Miss.1967); *Connor v. Johnson*, 256 F.Supp. 962 (S.D.Miss.1966). Consequently, court-ordered plans were implemented for the 1967 and 1971 elections.

2. In April, 1975, the Mississippi Legislature again attempted a reapportionment plan. The 1975 plan, although approved by the District Court, was declared ineffective by the Supreme Court until precleared pursuant to section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. *Connor v. Wal-*

*ler*, 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975). The Court's decision was without prejudice to a ruling by the *Connor* Court ordering the 1975 plan into effect if no other plan was formulated in time for the 1975 elections. *Id.* at 656–57, 95 S.Ct. at 2003.

3. On June 9, 1975, Mississippi submitted its 1975 reapportionment plan to the Attorney General for section 5 preclearance, and on June 10, 1975, the Attorney General interposed an objection to the plan.

4. On June 25, 1975, the *Connor* Court announced its intention to formulate a "temporary plan for the election of Senators and Representatives for the 1975 elections." *Connor v. Waller*, Civ. No. 3830 (S.D.Miss. June 25, 1975). Then, by orders of July 8 and July 11, 1975, the *Connor* Court ordered into effect an apportionment plan for the 1975 quadrennial election (hereinafter referred to as the "1975 court-ordered plan"). The 1975 quadrennial election in the Mississippi House and Senate, held in accordance with the 1975 plan, resulted in the election of the current Mississippi Legislature.

5. On November 18, 1976, the *Connor* Court formulated an apportionment plan to take effect for the 1979 quadrennial election. *Connor v. Finch*, 419 F.Supp. 1072, 1089 (S.D.Miss.), *supplemented in* 422 F.Supp. 1014 (S.D.Miss.1976) (hereinafter referred to as the "1976 court-ordered plan").

6. On May 31, 1977, the Supreme Court held that the 1976 court-ordered plan was unconstitutional on malapportionment grounds and returned the matter to the District Court with instructions to draft a new plan for the 1979 elections. *Connor v. Finch*, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977). The Court cautioned the District Court on remand to draw legislative districts that were reasonably contiguous and compact or to explain precisely why, in a particular instance, that goal could not be accomplished. *Id.* at 425–26, 97 S.Ct. at 1839–1840.

7. On August 2, 1977, the *Connor* Court directed the parties and invited the Missis-

sippi Legislature to file proposed plans for its consideration.

8. On August 9, 1977, the Governor of Mississippi called a special session of the legislature to consider the establishment of a joint legislative committee for the formulation of a legislative reapportionment plan.

9. At the August special session of the legislature, a Special Joint Committee on Reapportionment (hereinafter referred to as "the Joint Committee") was created and State Representative Thomas Campbell was elected its chairman. The Joint Committee retained as its special counsel, Mr. Jerris Leonard of Washington, D.C., former Assistant Attorney General of the United States for Civil Rights.

10. For the purpose of formulating the processed plan, the Joint Committee interviewed experts on apportionment recommended by the Attorney General of Mississippi, Jerris Leonard, and Marshall Turner, Assistant Chief of the Demographic Census Staff of the United States Bureau of the Census. Of those interviewed, the Joint Committee selected Mr. Thomas Hofeller of California, Dr. Delbert Dunn of Georgia, Mr. Calvin Webb of New York, and Dr. Richard Morrill of the State of Washington. Each of those selected had prior experience in the formulation of reapportionment plans.

11. In addition to those experts selected from outside the state, the Joint Committee hired Earl Fortenberry, formerly the Director of the Legislative Services Office of the State Senate, as Director of the Joint Committee's staff. Mr. Fortenberry had previously participated in the development of reapportionment plans for the Mississippi Senate. Fortenberry in turn hired as staff five people, including two blacks who were graduate students at Jackson State University, to assist with the efforts of the Joint Committee staff.

12. In formulating the plan, Joint Committee experts and staff were instructed by Special Counsel Jerris Leonard to minimize population deviations among districts, to avoid diluting black voting strength, to create one complete district in counties whose populations were large enough for the election of a representative or senator, to avoid splitting a county into more than two segments unless two or more districts could be derived from the same county, and to create compact and contiguous districts.

13. To avoid dilution of black voting strength, staff experts looked at the general demographic makeup of the state and noted that, as a general rule, black concentrations of population existed in western portions of the state. They further noted that, with certain exceptions, counties in the eastern portion of the state contained significantly fewer blacks. The experts tried to avoid the combining of counties in the western portion of the state, which contained heavy black population concentrations, with counties from the eastern portion of the state containing heavy white population concentrations. This goal was accomplished by running the district lines from north to south rather than from east to west.

14. Avoiding dual incumbencies was another goal which the Joint Committee attempted to achieve so long as it could be accomplished while observing the criteria given to the Committee staff for devising the plan. Hofeller and Fortenberry first prepared the plan without regard to incumbency. When requests for changes emanating from a dual incumbency situation arose, solutions were checked to assure that they did not adversely impact established criteria, especially those concerning the maintenance of de minimus deviation and avoidance of dilution of black voting strength. As a result of changes made in the plan to avoid dual incumbency, 46 senators and 106 representatives were preserved in their respective districts while 6 senators in three districts and 16 representatives in eight districts were pitted against other incumbents for reelection.

15. The Joint Committee developed a computer data base for the plan derived from 1970 census data acquired from the Bureau of the Census. The Joint Committee chose 1970 census data because it provided neutral data considered to be as accu-

rate as possible, available for the entire state, collected by similar methodology throughout the state, available for geographic areas within counties as well as for whole counties in the state, and easily replicated and verified for any given district or area.

16. The Joint Committee initially based its plan upon Census Enumeration District Lines (ED's) rather than precinct lines. After developing the ED plans for the House and Senate, the Joint Committee submitted the plans to the *Connor* Court. Both the Legislature and the Court expressed a preference for a plan using precinct lines as a means of avoiding voter confusion and of eliminating the need for reregistration of voters.

17. Because of the preference expressed for precinct lines, the Joint Committee staff was directed to convert the ED plan to a precinct plan by moving the boundaries of districts based on EDs to the nearest precinct line.

18. In order to convert the plans to precinct plans the Joint Committee found it necessary to obtain data on the EDs when split by precinct lines. The Joint Committee staff would draw the "split" of an ED on a Census Bureau map of the ED and forward the map to the Census Bureau. The Census Bureau would return population figures for both sides of the line splitting the ED. The Census Bureau, however, could not provide the exact racial composition of the split. This was determined by a computerized proportional allocation of black and white population within the ED to each side of the "split" line.

19. The resulting shift from the ED-based plan to a precinct-based plan was primarily a matter of refinement. It is not disputed that the basic configurations of the districts contained in the original ED plan and those of the resulting precinct plan are thus essentially the same.

20. The process used in developing the Joint Committee's plan was open to public participation and input. On October 11, 1977, the Joint Committee conducted public hearings on those plans presented to the District Court in *Connor*, and, on November 28, 1977, the Joint Committee conducted hearings on its statutory ED plan. No hearings were conducted on the precinct plan subsequently drawn from the ED plan. The hearings of October and November, 1977, were well publicized in advance and opportunity was afforded to all interested parties to submit their suggestions and objections.

21. The Joint Committee was responsive to those suggestions ultimately submitted. Suggestions were incorporated into the plan whenever the resulting redistricting was feasible in view of other criteria governing the formulation of the plans.

22. After months of consultation, the House plan as drafted by Hofeller and the Senate plan as drafted by Fortenberry were adopted by the Joint Committee and were introduced on the floor of the legislature. These two plans, submitted as H.B. 1491 and S.B. 3098 (hereinafter referred to as the "statutory plan") were adopted without floor amendment.

23. On April 21, 1978, the Governor of Mississippi approved and signed into law the two bills, S.B. 3098 and H.B. 1491, (Mississippi Laws, 1978, Chapters 535 and 515).

24. In June, 1978, the District Court in *Connor* directed the parties to confer for the purposes of arriving at a settlement of the *Connor v. Finch* litigation pending in the Southern District of Mississippi. The Joint Committee participated in these negotiations. In response to the objections to the statutory plan by the *Connor* plaintiffs, the boundaries of a number of districts in the plan were altered by the staff of the Joint Committee and a settlement proposal was submitted to the Joint Committee. The Joint Committee then informally polled the members of the Mississippi Legislature (the Legislature not being in session) to determine whether this settlement proposal was acceptable. In August, 1978, a majority of both houses of the Mississippi Legislature by a vote of 80 to 13 in the House and 26 to 7 in the Senate voted in favor of accepting the *Connor* settlement plan as an

alternative to the statutory plan. After this poll, the Joint Committee accepted the settlement plan and recommended to the defendants in *Connor* that they enter into a consent decree incorporating this settlement proposal.

25. On June 1, 1978, the Attorney General for the State of Mississippi, submitted the statutory plan to the Attorney General of the United States for federal preclearance pursuant to section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. By letter of July 31, 1978, the Attorney General, by his designated agent Drew S. Days, III, the Assistant Attorney General in charge of the Civil Rights Division, rendered a timely objection pursuant to section 5 of the Voting Rights Act stating that "we have been unable to conclude that the submitted plans for the Mississippi Senate and House of Representatives do not have the purpose or effect of abridging the right to vote because of race or color." Letter from Drew S. Days, III, to Mississippi Attorney General A. F. Summer, July 31, 1978.

26. On August 1, 1978, Mississippi's Attorney General received, by telephone, notification of the Attorney General's objection. The same day, the State of Mississippi filed this action against the United States and Attorney General Griffin B. Bell seeking a declaratory judgment pursuant to section 5 of the Voting Rights Act.

27. On August 31, 1978, ten black citizens and registered voters of the State of Mississippi filed a motion to intervene as defendants and attached to their motion their proposed answer denying the material allegations of the complaint, denying that plaintiff was entitled to the relief requested, and alleging as an affirmative defense that the statutory plans "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the franchise" in violation of their rights secured by section 5 of the Voting Rights Act, and further that the statutory reapportionment plan dilutes, minimizes, and cancels out black voting strength in violation of intervenors' rights secured by the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution. On September 18, the Court granted intervenors' motion for leave to intervene and to file their answer in intervention (order of September 18, 1978). As stated previously, this matter was subsequently heard during the weeks of September 18 through September 27. After proposed findings of fact and conclusions of law with accompanying briefs had been submitted, oral argument was conducted on January 16, 1979.

28. On March 26, 1979, the Supreme Court, upon a motion to seek a writ of mandamus, instructed the *Connor* court to issue a reapportionment plan forthwith, in accordance with its previous mandate in *Connor v. Finch*, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977).

29. On April 13, 1979, the Southern District of Mississippi issued a final judgment in *Connor v. Finch* and adopted a slightly modified version of the settlement plan previously submitted to the court by the parties. It is undisputed that the resulting court-ordered plan is not substantially different from the settlement plan from which it was drawn.[1]

II. *Present Voting Conditions in Mississippi:*

30. Pursuant to its Constitution, Mississippi has maintained a bicameral legislature made up of a Senate and a House of Representatives. Members of each branch are elected guadrennially. The Constitution of Mississippi requires that the Senate consist of no less than 45 but no more than 55

---

1. The court-ordered plan of April 13, 1979, while not in existence at the time this Court heard this case, is a matter of judicial notice. Throughout these Findings of Fact and Conclusions, it is treated as substantially identical to the settlement plan and has been so conceded by all parties. Defendant United States' letter to the Court of April 17, 1979 ("Substantially the same as the settlement plan"); Defendant-intervenors supplemental memorandum of April 27, 1979 ("The court-ordered plan of April 13, 1979 orders the settlement plan into effect 'with three minor changes' which do not affect 'any of the majority black districts in the settlement plan.' ").

members. Similarly, the Mississippi Constitution requires that the House consist of no more than 122 members. The Senate currently consists of 52 members and the House consists of 122.

31. Any registered voter in Mississippi can have his or her name placed upon the ballot as an independent candidate in the general election for the Mississippi Legislature by presenting a petition to the appropriate body designated in the statute signed by 50 registered voters 60 days before the quadrennial general election. Miss.Code Ann. § 3260 (1942). To be elected, a candidate thus nominated needs only a plurality in a general election, Miss.Code Ann. § 3279 (1942 & Supp.1978) *as amended* by H.B. 44 (Chapter 429, Mississippi Laws 1978). A candidate for party nomination, on the other hand, must win a majority of the votes cast in order to win the nomination of his party. Miss.Code Ann. § 23–3–69 (1972).

32. According to the 1970 census, blacks in Mississippi comprise 36.8 percent of the total population of the state and 31.5 percent of the state's voting age population (hereinafter referred to as "VAP").

33. Mississippi has in the past used such devices as the literacy test, the poll tax and the white primary to exclude its black citizens from participation in the electoral process. Indeed, until passage of the Voting Rights Act in 1965, use of racially discriminatory tests and devices effectively excluded black people in Mississippi from exercise of the franchise. *Stewart v. Waller*, 404 F.Supp. 206 (N.D.Miss.1975) (three-judge court) (per curiam); *United States v. State of Mississippi*, 229 F.Supp. 925, 983, 987 (S.D.Miss.1964), *rev'd and remanded*, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965).

34. The effect of Mississippi's past history of racial discrimination in voting and other areas continues to affect black people in many portions of the state today, which has resulted in a generally lower participation by blacks than whites in the political process. Consequently, proportionally fewer blacks are registered to vote than whites, and black voters turn out at the polls at a lower rate than white voters.

35. Analysis of past election returns show that racial bloc voting has prevailed throughout the State of Mississippi. Those participating in the electoral process suggest that racial bloc voting continues to occur throughout the state today.

36. Low black voter registration and voter turn-out combined with racial bloc voting make it necessary for an electoral district in Mississippi to contain a substantial majority of black eligible voters in order to provide black voters with an opportunity to elect a candidate of their choice. It has been generally conceded that, barring exceptional circumstances such as two white candidates splitting the vote, a district should contain a black population of at least 65 percent or a black VAP of at least 60 percent to provide black voters with an opportunity to elect a candidate of their choice.

37. Recent legislative reapportionments in Mississippi have failed to meet constitutional requirements and have been marked by the racially discriminatory use of multi-member districts. *Connor v. Williams*, 404 U.S. 549, 92 S.Ct. 656, 30 L.Ed.2d 704 (1972); *Connor v. Johnson*, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971). Such uses of multi-member districts have, in the past, tended to submerge black population concentrations in heavily white concentrations.

38. The present legislature in Mississippi was elected pursuant to a 1975 temporary court-ordered plan containing multi-member districts.

39. Only four out of 122 house seats in the Mississippi legislature today are occupied by blacks. None of the 52 senate seats is occupied by blacks.

III. *Nature of the Statutory Plan:*

40. Viewing the state as a whole, and comparing the statutory plan with the demographic distribution of population among Mississippi's 82 counties, the evidence demonstrates that the plan, in overall statistical effect, reflects the geographic distribution of black population within the state.

41. The maximum deviation of S.B. 3098 is 11.39 percent. The maximum deviation of H.B. 1491 is 10.8 percent. These are consistent with the broader tolerances allowed legislatures, but not courts, in fashioning apportionment plans.[2]

42. Mississippi's counties are unequal in population. While 30.5 percent of Mississippi's counties have a majority black population, only 25.2 percent of the state's population live in those counties. 30.8 percent of the senate districts in S.B. 3098 have black majority populations. This percentage closely corresponds to the number of counties that have a majority black population.

43. 24.6 percent of the house districts have a majority black population. The percentage of black majority districts in H.B. 1491 is lower than the percentage of black majority districts in S.B. 3098 (30.8%) and the corresponding percentage of black majority counties (30.5%). Senate districts and counties, however, are larger geographically than the 122 house districts. The smaller house districts in H.B. 1491 contain greater densities of black population than do the larger geographic units. Black majority house districts in H.B. 1491 average 65.4 percent in black population while the corresponding figure for counties is 60.77 percent and for senate districts in S.B. 3098 is 59.3 percent.

44. The statutory plan enhances potential black voting strength when compared to the 1975 court-ordered plan. The statutory plan contains two more black VAP majority districts in the senate (10) and four more black VAP majority districts in the house (26) than the 1975 court-ordered plan. It also contains two districts in the senate with a black VAP of 60 percent or more and ten more districts in the house (14) with a black VAP of 60 percent or more. Furthermore, the statutory plan contains single-member districts only.

2. Comparison of total deviations from population equality of the statutory plan with the settlement plan.

|  | Senate | House |
|---|---|---|
| State's Statutory Plan | 11.39% | 10.08% |
| Connor Settlement Plan | 11.39% | 9.94% |

45. A statistical comparison of the 1975 court-ordered plan with the statutory plan demonstrates the following with regard to black voting age population (VAP):

| % Range | 1975 Plan (No. of Dists House) | H.B. 1491 (No. of Dists House) | 1975 Plan (No. of Dists Senate) | S.B. 3098 (No. of Dists Senate) |
|---|---|---|---|---|
| 40–100% | 40 | 38 | 14 | 16 |
| 45–100% | 30 | 30 | 12 | 14 |
| 50–100% | 22 | 26 | 8 | 10 |
| 55–100% | 11 | 20 | 1 | 7 |
| 60–100% | 4 | 14 | 0 | 2 |
| 65–100% | 3 | 7 | 0 | 0 |
| 70–100% | 3 | 3 | 0 | 0 |
| 75–100% | 2 | 0 | 0 | 0 |
| 80–100% | 1 | 0 | 0 | 0 |
| 86–100% | 0 | 0 | 0 | 0 |

46. The following table contains statistical comparison of the statutory plan with the settlement plan adopted by the *Connor* Court on April 13, 1979, broken down to show the number of black majority districts and black VAP majority districts for both the Senate and the House:

|  | Connor Settlement Plan (Ex. P–35) | State's Statutory Plan (Exs. P–4A, 4B) |
|---|---|---|
| Black Pop. Majority Districts | 49 | 46 |
| Black VAP Majority Districts | 39 | 36 |
| **HOUSE** | | |
| Black Pop. Majority Districts | 34 | 30 |
| 65% + | 18 | 15 |
| 60%–65% | 5 | 6 |
| 55%–60% | 5 | 5 |
| 50%–55% | 6 | 4 |
| Black VAP Majority Districts | 28 | 26 |
| 65% + | 9 | 7 |

Total deviation, as used herein, is the total span of variances calculated by adding the largest plus variance and the largest minus variance.

| | Connor Settlement Plan (Ex. P-35) | State's Statutory Plan (Exs. P-4A, 4B) |
|---|---|---|
| 60%–65% | 6 | 7 |
| 55%–60% | 7 | 6 |
| 50%–55% | 6 | 6 |
| **SENATE** | | |
| Black Pop. Majority Districts | 15 | 16 |
| 65% + | 3 | 4 |
| 60%–65% | 4 | 3 |
| 55%–60% | 5 | 5 |
| 50%–55% | 3 | 4 |
| Black VAP Majority Districts | 11 | 10 |
| 65% + | 1 | 0 |
| 60%–65% | 0 | 2 |
| 55%–60% | 6 | 5 |
| 50%–55% | 4 | 3 |

## IV. Defendant and Defendant-Intervenors' Objections to the Statutory Plan:

47. Defendant and defendant-intervenors object, in particular, to the redistricting in the statutory plan of the following counties:[3]

## 1. HOUSE PLAN

### (a) Warren County

The defendants and intervenors complain that, in the statutory plan's redistricting of Warren County, a heavy black population concentration is divided among three proposed house districts, turning a black majority into a black minority in all three districts. This expression of concern regarding the statutory configuration of Warren County was first reflected in the record during the January 10, 1978 deposition of Hofeller. This configuration was in draft form at the time of the public hearings and no objection had been raised. By that time, however, expert Hofeller's discretion was limited to simply converting the ED plan into a precinct plan. The opportunity to make basic changes to the configuration of districts was no longer open. The settlement plan, which addresses the problem, is thus only a marginal improvement insofar as blacks are concerned, a difference which would not translate into a difference in black representation. The Warren County districts in the settlement plan also remain below the 60% black VAP requisite for districts in which blacks are able to elect a candidate of their choice.

3. We note that several of the defendant-intervenors find themselves in districts more heavily black under the Connor Settlement Plan than under the statutory plans. This fact, in addition to defendant-intervenors' preference for reapportionment by Court decree rather than reapportionment by the legislature, may largely provide the explanation for their intervention in this litigation. (See testimony of Aaron Henry, Tr. pp. 801–02).

**STATUTORY PLAN**

| NAME | COUNTY | SENATE | | HOUSE | |
|---|---|---|---|---|---|
| | | POP. | VAP | POP. | VAP |
| Aaron Henry | Coahoma | Same | Same | Same | Same |
| Henry Kirksey | Hinds | 65.44 | 62.93 | Same | Same |
| Bennie Thompson | Hinds | 42.01 | 35.41 | 46.30 | 39.21 |
| Barney Schoby | Adams | Same | Same | 63.23 | 60.63 |
| David Jordan | Leflore | Same | Same | 42.89 | 37.72 |
| Fred Banks | Hinds | 65.44 | 62.93 | Same | Same |

**SETTLEMENT PLAN**

| NAME | COUNTY | SENATE | | HOUSE | |
|---|---|---|---|---|---|
| | | POP. | VAP | POP. | VAP |
| Aaron Henry | Coahoma | Same | Same | Same | Same |
| Henry Kirksey | Hinds | 72.33 | | Same | Same |
| Bennie Thompson | Hinds | 49.71 | | 66.79 | 59.02 |
| Barney Schoby | Adams | Same | Same | 69.40 | 66.45 |
| David Jordan | Leflore | Same | Same | 75.77 | 71.72 |
| Fred Banks | Hinds | 72.33 | | Same | Same |

### (b) *Hinds County*

The defendants and intervenors complain that the black population concentration in western Hinds County is fragmented, and the resulting three portions of that concentration are paired with greater white population concentrations in Clinton and the Jackson suburbs. In the settlement plan, the boundaries of the three districts that trisect rural Hinds County do not fracture the black concentration in the western portion of the county. As a result, the settlement plan provides a district in rural Hinds County with a 69 percent black VAP. Representative Buckley, a black member of the Joint Committee from Hinds County and the other three black house members from Hinds County, apparently never raised the question of a majority black rural district prior to the legislature's action. The present objections to the redistricting of Hinds County were not brought to the Committee's attention until December, 1977. The Joint Committee originally intended to follow existing districts in the 1975 plan, which had been approved by the federal court, and to increase the number of black VAP districts from 3 to 5. Representative Buckley objected that such a plan would spread the black population too thinly. In response to Buckley's objection, the plan was changed by reducing the number of black majority seats to four. The enhancement now sought by the defendants and intervenors is of debatable benefit and departs from the traditional plan approved by the federal court, which drew lines from east to west rather than north to south. In addition, in order to create the black VAP in rural Hinds County, the settlement plan necessarily dilutes adjacent districts.

### (c) *Adams County*

Defendants and intervenors object to the statutory plan's redistricting of Adams County because the only majority black supervisor's district is split between two districts. The black voting strength in north Adams is allegedly diluted by excluding the majority black airport precinct from the north Adams district and by pairing north Adams and north Natchez with heavily white precincts. In the settlement plan, the two legislative districts that bisect Adams County leave the only black supervisor's district intact and entirely within the same legislative district, *i. e.*, district 95.

In a memorandum to the Legislative Committee on Reapportionment written by an associate of defendant-intervenors' counsel on behalf of Representative Buckley (hereinafter referred to as the "Barber Memorandum"),[4] Buckley requested a slight shift in the configuration of district 95. In response to Buckley's request, the Committee increased the black VAP in that district, but did not realize that intervenors would not be satisfied unless the Morgantown precinct were eliminated. The resulting increase of five percent in the black VAP of Adams County by excluding the Morgantown precinct, however, would be at the expense of diluting neighboring districts.

### (d) *Leflore County*

Defendants and intervenors complain that the statutory plan fragments the southeast Greenwood black concentration. The greatest portion of that black community is paired with heavily white north Greenwood in a white majority district. The remaining black community is put in a predominantly rural district, which, although majority black, does not have a high enough black VAP to enable blacks to elect candidates of their choice. The settlement plan keeps the black population concentration in south Greenwood intact (except for one heavily black ED) and entirely within one legislative district. The districts proposed in the settlement plan, however, are less compact to a considerable degree than the districts in the statutory plan and would also divide the city of Greenwood to a greater extent. The settlement plan increases the black VAP percentage from 64.26 percent to 71.22 percent, while it diminishes the influence of the blacks residing in the adjacent district.

---

4. The vast majority of the suggestions contained in the Barber Memorandum was incorporated in the statutory plan. See plaintiff's reply brief, pp. 43–45 for detail.

### (e) *Marshall County*

Defendants and intervenors object that the statutory plan for Marshall County splits the only supervisors' district which has elected a black supervisor in that county and that the voting strength of the black voters in the county's house district is diluted and minimized by the inclusion of the heavily white Holly Springs precinct No. 5. In the settlement plan, the black supervisor's district is placed almost entirely within district 5 with the result that blacks comprise 62 percent of the VAP. Prior to voicing these objections, however, the intervenors had indicated to the Committee a preference for keeping the city of Holly Springs intact. The configuration now preferred by the intervenors would split the city of Holly Springs. The sole difference between the plans lies in the allocation of one precinct. The result sought by the intervenors would create a district with a black VAP 6 percentage points higher. This gain is at the expense of creating an irregular shaped district that splits the only major city in the district.

### (f) *Desoto County*

Defendants and intervenors contend that the statutory plan avoids the creation of a black population majority district in Desoto County by dividing the county by a north/south boundary. The plan splits up the rural predominantly black portion of the county and includes in each district portions of the heavily white Memphis suburban area in north Desoto County. In the settlement plan, the black population concentration in rural Desoto is left intact. As a result, a majority black population district is created. The settlement plan, however, increases the black voting age population in the district it seeks to change by only 1.8 percent and fails to create a 50 percent black VAP majority. The record does not reflect when, if ever, this particular change was called to the attention of the legislature. Intervenors' initial plan, which they submitted to the *Connor* Court, is identical in its configuration of Desoto County as the statutory plan.

## 2. SENATE PLAN

### (a) *Hinds County*

Defendants and intervenors contend that the statutory plan forms a "seahorse district" in its Hinds County Senate plan that pairs a portion of the central Jackson black population with the heavily white south Jackson area. They contend that alternative plans proposed to the *Connor* Court are more compact and form black populations of over 60 percent in districts 25 and 26. There is no evidence that this change was ever called to the attention of the Committee prior to the enactment of the statutory plan. In any event, the change sought merely increases the black population in an already 60 percent black majority VAP district, a change of dubious benefit to black representation.

### (b) *Holmes, Madison and Humphreys Counties*

Defendant and intervenors complain that out-migration of blacks in recent years from the Holmes, Madison and Humphreys Counties has resulted in decreasing the actual VAP percentage in the statutory plan's redistricting of the area to less than 60 percent. The settlement plan combines Holmes and Humphreys counties and the northern portion of Yazoo County. Defendants and intervenors contend that this configuration is more compact and would provide black voters with a better chance to elect a candidate of their choice. The record does not reflect any evidence that the requested combination of these counties in a single district was called to the attention of the Committee staff at any time prior to the passage of the statutory plans. In any event, the settlement plan would split Madison County across the middle and would dilute the vote in Yazoo County and in north Madison. The change would result in a net decrease of one 60 percent black VAP majority district.

### (c) *Washington, Sharkey and Issaquena Counties*

Defendants and intervenors contend that the statutory plan splits the heavy black

concentration in north Greenville and north Washington County between two long, narrow districts, which stretch south for more than 60 miles. The resulting district 22 is majority white, and district 23, although majority black, is alleged to be so diluted that black voters are denied representation of their choice. The settlement plan creates a district that preserves much of the black population in urban Greenville intact within one district. Defendants and intervenors argue that although the settlement plan's district is only about 2 percentage points greater in black majority VAP, it provides black voters with a much better opportunity to elect a candidate because it comprises an urban area where blacks are generally better organized and more politically aware. Intervenor's expert testified that any district drawn in this area would look suspicious because of the small population in the rural areas. The drafters of the statutory plans attempted to draw a more compact plan than the predecessor 1975 plan. The resulting change increases the black VAP in one district by 1.42 percent. We find that the changes in the settlement plan are not significantly different from those created by the statutory plan or ameliorative of the problem of formulating compact districts in the area.

### (d) Claiborne, Jefferson and Copiah Counties

Defendants and intervenors object to the statutory plan's pairing of Jefferson and Claiborne Counties with majority white Franklin County and the western half of Copiah County. Alternative plans submitted to the Connor Court excluded Franklin County or portions of Copiah. The Connor plaintiff's plan combined Jefferson and Claiborne with Copiah to form a district with a 55 percent black VAP. Under the statutory plan, however, the Jefferson and Claiborne County districts have a 75.77 percent black population. The intervenors conceded in their Barber Memoran-

dum to the Joint Committee that the Claiborne/Jefferson area could not be hurt by either plan because of its high black voting age population.

48. The evidence demonstrates that the plaintiff's agents in formulating the statutory plan did not act with the intent or purpose of denying or abridging the right to vote of any citizen of Mississippi on account of race. Rather, the individuals involved in drafting and enacting the statutory plans acted with the purpose of creating black VAP majority districts.

49. The evidence demonstrates that differences in black voting strength provided in the statutory plan and in the Connor settlement plan are insubstantial. The statutory plan covering both the Senate and the House contains three (3) less black majority voting districts.[5] Since there are 174 districts in the Mississippi Legislature this is an overall difference of 1.7 percent (1.7%). For the Senate, the statutory plan contains one (1) more black majority district than the Connor settlement plan. More important, both plans provide the same number (16) of black, VAP majority districts with a population of 60 percent or more (see Finding 36 for the significance of this fact and Table in Finding 46 for critical figures). When compared to the settlement plan adopted by the Connor Court on April 13, 1979, the legislative plan is not retrogressive in overall black voting strength and does not have the effect of abridging or denying the right to vote of any citizen of Mississippi on account of race.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction to hear and determine this case. Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (1974 & Supp. V 1975).

2. This Court has been properly convened as a court of three judges. Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c

---

**5.** In these three districts, the black majority is less than 60 percent VAP. As "influence districts," they, standing alone, do not represent a significant difference, according to the Assist-

ant Attorney General of the United States for Civil Rights, such as to suggest an improper purpose under section 5. (Days' depo., Pltf's Ex. 25, Tr. pp. 112–115).

(1974 & Supp. V 1975) (hereinafter "section 5"); 28 U.S.C. § 2284 (1976).

3. All the requirements for a Rules 23(a) and 23(b)(2) defendant class action on behalf of the intervenors are met. The defendant class is defined as all black citizens and black registered voters in Mississippi qualified to vote in state legislative elections. Fed.R.Civ.P. 23(a) & 23(b)(2).

4. The Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.* (1974), was enacted to insure the protection of rights guaranteed by the Fifteenth Amendment and "to rid the country of racial discrimination in voting." *South Carolina v. Katzenbach,* 383 U.S. 301, 315, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966).

5. Section 5 of the Voting Rights Act was intended to insure that the gains thus far achieved in minority political participation would not be emasculated or destroyed through new discriminatory procedures and techniques. S.Rep. No. 94–295, at 19, U.S. Code Cong. & Admin.News 1975, p. 774.

6. The State of Mississippi is a state subject to the preclearance requirements of section 5. 30 Fed.Reg. 9897 (August 7, 1965).

7. Under section 5, Mississippi may not enforce or implement any change in "any voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting" unless such change has either been approved by the Attorney General, or unless Mississippi obtains a declaratory judgment in the United States District Court for the District of Columbia that such change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c (1974 & Supp. V 1975).

8. The reapportionment plan adopted by the Mississippi Legislature in 1978 regular session, approved by the Governor on April 12, 1978, and the changes resulting therefrom are within the scope of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (1974 & Supp. V 1975); *Georgia v. United States,* 411 U.S. 526,, 531–35, 93 S.Ct. 1702,

1706–1708, 36 L.Ed.2d 472 (1973); *Beer v. United States,* 425 U.S. 130, 138, 96 S.Ct. 1357, 1362, 47 L.Ed.2d 629 (1976).

9. In an action for declaratory judgment under section 5, the burden of proof is on the plaintiff. *Georgia v. United States,* 411 U.S. 526, 538, 93 S.Ct. 1702, 1709, 36 L.Ed.2d 472 (1973); *South Carolina v. Katzenbach,* 383 U.S. 301, 328, 86 S.Ct. 803, 818, 15 L.Ed.2d 769 (1966).

10. Plaintiff's burden in a suit for declaratory relief under section 5 is to demonstrate that the reapportionment plan described in S.B. 3098 and H.B. 1491 do not lead to a retrogression in the position of racial minorities, or that the proposed change fairly reflects the strength of black voting power as it exists. *Beer v. United States,* 425 U.S. 130, 139 n. 11, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976); *Richmond v. United States,* 422 U.S. 358, 362, 95 S.Ct. 2296, 2299, 45 L.Ed.2d 245 (1975).

11. Mississippi, in meeting its burden of proof, must demonstrate that a racially discriminatory purpose was not among the factors that motivated it in devising its reapportionment plan. *Richmond v. United States,* 422 U.S. 358, 362, 95 S.Ct. 2296, 2299, 45 L.Ed.2d 245 (1975).

12. A discriminatory purpose need not be express, but may be inferred from the totality of the relevant facts. *Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976).

13. Black voting strength is impermissibly diluted when, designedly or otherwise, an apportionment scheme under the circumstances of a particular case would operate to minimize or cancel out the voting strength of racial elements of the voting population. *Burns v. Richardson,* 384 U.S. 73, 88, 86 S.Ct. 1286, 1294, 16 L.Ed.2d 376 (1966); *Fortson v. Dorsey,* 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965).

14. In a single-member districting plan, black voting strength may be unconstitutionally and impermissibly diluted, minimized, and cancelled out (1) when heavy black population concentrations are

unnecessarily fragmented and dispersed, and (2) when black population concentrations to deny black voters the opportunity to elect candidates of their choice. *Connor v. Finch*, 431 U.S. 407, 421–25, 97 S.Ct. 1828, 1837–1839, 52 L.Ed.2d 465 (1977); *Kirksey v. Board of Supervisors of Hinds County, Mississippi*, 554 F.2d 139, 149 (5th Cir.) (en banc), *cert. denied*, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977); *Robinson v. Commissioners Court, Anderson County, Texas*, 505 F.2d 674, 679 (5th Cir. 1974); *Moore v. Leflore County Board of Election Commissioners*, 502 F.2d 621, 622–24 (5th Cir. 1974); *Sims v. Baggett*, 247 F.Supp. 96, 109 (M.D.Ala.1965) (three-judge court).

■ 15. No state or political subdivision is required to search for ways to maximize the number of black voting age population districts. Likewise, no racial group has a constitutional or statutory right to an apportionment structure designed to maximize its political strength. *Richmond v. United States*, 422 U.S. 358, 370–72, 95 S.Ct. 2296, 2303–2304, 45 L.Ed.2d 245 (1975); *Gilbert v. Sterrett*, 509 F.2d 1389, 1394 (5th Cir. 1975); *Cousins v. City Council of City of Chicago*, 503 F.2d 912, 920 (7th Cir. 1974); *Turner v. McKeithen*, 490 F.2d 191, 197 (5th Cir. 1973); *Howard v. Adams County Board of Supervisors*, 453 F.2d 455, 458 (5th Cir. 1972).

■ 16. A legislative reapportionment plan that enhances the position of racial minorities with respect to their effective exercise of the electoral franchise cannot have "the effect" of diluting or abridging the right to vote on account of race within the meaning of section 5 unless the new apportionment itself so discriminates as to violate the Constitution. *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976).

■ 17. Although reapportionment plans, which are formulated with less concern for statistical accuracy and the one-person-one-vote concept, may provide a greater number of black majority districts, departure from equal protection one-person-one-vote strictures cannot be required or justified simply as an affirmative act to maximize black voting strength. *See Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 2751, 57 L.Ed.2d 750 (1978); *Mahan v. Howell*, 410 U.S. 315, 328–30, 93 S.Ct. 979, 986–987, 35 L.Ed.2d 320 (1973); *White v. Weiser*, 412 U.S. 783, 790–93, 93 S.Ct. 2348, 2352–2353, 37 L.Ed.2d 335 (1973.)

■ 18. *Beer* commands comparison with a preexisting plan to determine "whether the ability of minority groups to participate in the political process and to elect their choices to office is augmented, diminished, or not affected by the change affecting voting . . ." *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976).

19. The settlement plan, adopted by the *Connor* Court on April 13, 1979, must now be considered the preexisting plan and the benchmark with which to compare the statutory plan.[6]

■ 20. When compared with the *Connor* Settlement Plan, and taking into account the totality of criteria governing the formulation of the statutory plan and its alternatives, we conclude that the slight differences are not of such significance to find that the statutory plan is retrogressive with respect to black voting strength in Mississippi as it exists today. The proof in this case demonstrates that H.B. 1491 and S.B. 3098 would not lead to a retrogression in the current position of racial minorities with respect to their effective exercise of the electoral franchise and therefore do not have the "effect of denying or abridging

6. When compared with the 1975 plan, S.B. 3098 and H.B. 1491 constitute a clear enhancement of the position of racial minorities with respect to their effective exercise of the electoral franchise because S.B. 3098 and H.B. 1491 have a greater number of black voting age majority districts than did the 1975 plan and they provide higher percentages of black voting strength in those districts than did the 1975 plan. Moreover, the statutory plan is the first plan to utilize single-member districts only and avoids the diluting effect of multi-member districts.

the right to vote on account of race or color." This conclusion to disregard insignificant differences is further supported by the fact that legislative reapportionment is the preferred vehicle for reapportionment, as is reflected by the broader tolerances which are allowed to legislatures, but not to courts, in the matter of deviations from uniform population requirements. As the Supreme Court recently stated, "The Court has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal Courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978).

21. Legislative reapportionment plans must be scrutinized to determine if they were enacted with the prohibited "purpose" of denying or abridging black voting strength. The prohibited "purpose" of section 5 may be described as the sort of invidious discriminatory purpose that would support a challenge to official action as an unconstitutional denial of equal protection. A law neutral on its face and serving legitimate state ends cannot be held invalid under the Equal Protection Clause without proof of discriminatory purpose. Accordingly, in examining the statutory plan, proof of discriminatory racial purpose is necessary for a finding of the "purpose" proscribed in section 5. *Washington v. Davis*, 426 U.S. 229, 239–48, 96 S.Ct. 2040, 2047–2051, 48 L.Ed.2d 597 (1976).

22. Mississippi's evidence demonstrates that the principal actors in the development of S.B. 3098 and H.B. 1491 acted with a benign purpose.[7] Defendants concede they have no evidence to the contrary and are unable to name anyone they contend acted with improper purpose. Defendant-intervenors, likewise, have failed to introduce such evidence.

23. Defendants and defendant-intervenors have suggested that incumbency concerns in the fashioning of the legislature's plans resulted in an impermissibly racially-discriminatory purpose. It is not improper, however, for a legislative body to consider incumbency in fashioning a reapportionment plan, nor does it demonstrate invidiousness, especially here where the evidence shows incumbency concerns were not permitted to encroach upon configurations designed to recognize and protect black voting strength. *White v. Weiser*, 412 U.S. 783, 797, 93 S.Ct. 2348, 2355, 37 L.Ed.2d 335 (1973); *Burns v. Richardson*, 384 U.S. 73, 89 n. 16, 86 S.Ct. 1286, 1295, 16 L.Ed.2d 376 (1966).

24. The implementation of S.B. 3098 and H.B. 1491 for the 1979 quadrennial legislative elections in the State of Mississippi will not have either the purpose or effect of denying or abridging the full and free exercise of the right to vote of black citizens in that state.

25. Plaintiff's prayer for a declaratory judgment preclearing S.B. 3098 and H.B. 1491 as a valid reapportionment plan for use in the 1979 quadrennial election should be granted.

26. Since the statutory plan is upheld, it shall supersede the *Connor* Court plan of April 13, 1979. *Per curiam* opinion of the United States Supreme Court in *Connor v. Coleman*, 440 U.S. 612, 99 S.Ct. 1523, 59 L.Ed.2d 619 (1979).

---

7. The basic configuration of the statutory plan was complete in December, 1977, well prior to the submission to the *Connor* Court of various alternative plans, which culminated in the settlement plan adopted by the *Connor* Court on April 13, 1979.