CONNOR ET AL. *v.* COLEMAN, JUDGE, UNITED STATES
COURT OF APPEALS, ET AL.

No. 78–1013.   Decided March 26, 1979

PER CURIAM.

Petitioners are plaintiffs in a suit seeking reapportionment
of the Mississippi Legislature.   In the most recent of the
Court's decisions in this extended litigation, *Connor* v. *Finch,*
431 U. S. 407, 426 (1977), it reversed the judgment of the
District Court and directed that court to draw a new reap-
portionment plan for the 1979 elections "with a compelling
awareness of the need for its expeditious accomplishment."

On remand, and after further proceedings, the parties devel-
oped a settlement plan.   Negotiations broke down, however,
over the wording of a consent decree.   In the meantime, the
State had adopted a new statutory reapportionment plan
fashioned by the legislature.   Because the Attorney General
of the United States, acting pursuant to the Voting Rights

Act of 1965, 42 U. S. C. § 1973c, refused to approve the legislature's plan, the State brought suit under the Act in the United States District Court for the District of Columbia, seeking a declaration that the plan does not have a discriminatory purpose or effect.

Acting on the state defendants' motion, the District Court in this case determined to stay all proceedings until judgment was entered in the District of Columbia litigation. If upheld, the statutory plan would supersede any court-ordered one. See *Wise* v. *Lipscomb*, 437 U. S. 535, 539–542 (1978). Petitioners then submitted this motion for leave to file a petition for a writ of mandamus to require the District Court to adopt a plan. Petitioners contend that some reapportionment scheme must be in effect by June 7, the filing deadline for the 1979 elections. Petitioners argue that the legislature's plan may not be in effect by that date, and that, unless the court files its plan now, time limitations effectively will preclude them from obtaining review of that order in this Court. It is argued in response that immediate filing would be unduly disruptive if the filed plan were supplanted before June 7. The District Court has indicated, however, that, absent the conclusion of the District of Columbia suit, it will order a plan into effect on May 7.

The only issue here, therefore, is whether this Court should require the District Court to file its plan now rather than on May 7; we do not question the good faith of the District Court. We believe, however, that the better course is to file its plan now. In the unlikely event that a legislative plan should supersede the court plan before May 7, potential candidates would have more than a month to reassess their prospects. If, on the other hand, the legislative plan does not go into effect and the court plan is filed only on May 7, this Court will be faced with requests for emergency review that, if granted, could force changes only days before the June 7 deadline.

Leave to file the petition is therefore granted. The District Court is instructed, forthwith and without further delay, to adopt a final plan for the reapportionment of the Mississippi Legislature. Our consideration of the petition for a writ of mandamus is continued for 30 days. See *Connor* v. *Coleman*, 425 U. S. 675, 679 (1976).

*It is so ordered.* ∎

MR. JUSTICE POWELL took no part in the decision of this motion.

MR. JUSTICE MARSHALL, dissenting.

For 13 years, the three-judge District Court for the Southern District of Mississippi has avoided implementing an apportionment plan for that State which satisfies the requirements of the Equal Protection Clause. The case now comes before us for the eighth time, after the District Court chose to ignore our directive, issued nearly 22 months ago, that it resolve this controversy expeditiously. In my view, the Court cannot tolerate such defiance. Accordingly, not only would I grant plaintiffs' motion, which the United States supports, for leave to file a petition for writ of mandamus, but I would issue the writ as well.

This litigation began in 1965 when private plaintiffs successfully challenged the extreme population variances of the existing legislative apportionment. *Connor* v. *Johnson*, 256 F. Supp. 962 (1966). After the legislature enacted a reapportionment that failed to meet constitutional standards, the District Court formulated its own temporary plan for the 1967 quadrennial elections. Under the plan, 34 of the 52 house districts and 10 of the 36 senate districts were multimember. See *Connor* v. *Finch*, 431 U. S. 407, 410 n. 3 (1977). The variance from absolute population equality

between the largest and smallest house districts was 20.83%, and the variance in senate districts was 23.24%. *Connor* v. *Johnson,* 265 F. Supp. 492, 504–507 (1967). On appeal, this Court affirmed without opinion use of the temporary plan. 386 U. S. 483 (1967).

The District Court struck down a second legislative reapportionment in 1971. In its place, the court devised a final plan for the 1971 elections which authorized multimember representation for most house districts and almost half of the senate districts. *Connor* v. *Johnson,* 330 F. Supp. 506 (1971). The court failed to formulate a final plan for the State's three largest counties, instead ordering interim multimember representation in those areas.

Upon the plaintiffs' motion, this Court stayed the judgment of the District Court. Emphasizing that "when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multimember districts as a general matter" because they more closely reflect voter preferences, *Connor* v. *Johnson,* 402 U. S. 690, 692 (1971), we ruled that the District Court could have implemented single-member districts for one of the three counties before the June 4 filing deadline. We therefore instructed the court to extend the deadline to June 14, 1971, and, "absent insurmountable difficulties," to "devise and put into effect" a single-member district plan for the county by that date. *Ibid.* On remand, however, the court did not institute single-member districts because it found that the difficulties were in fact insurmountable. *Connor* v. *Johnson,* 330 F. Supp. 521 (1971). This Court denied further interlocutory relief. 403 U. S. 928 (1971).

The case came here again on direct appeal after the 1971 elections. We unanimously concluded that the 18.9% variance between the largest and smallest senate districts, and the 19.7% variance between the largest and smallest house districts "raise[d] substantial questions concerning the constitu-

tionality of the District Court's plan as a design for permanent apportionment." *Connor* v. *Williams,* 404 U. S. 549, 550 (1972). Nevertheless, the Court declined to invalidate elections that had already been held. *Id.,* at 550–551. Similarly, we found it unnecessary to determine the prospective validity of the plan because the District Court had retained jurisdiction over the three counties in which it had imposed interim multimember representation and had stated that a Special Master would be appointed in January 1972 to consider whether these counties could be divided into districts of substantially equal population for the 1975 and 1979 elections. *Id.,* at 551. Reiterating our preference for single-member districts in judicially fashioned apportionment plans, we summarily vacated and remanded the case with directions that the proceedings before a Special Master "go forward and be *promptly* concluded." *Ibid.* (emphasis added).

Despite our instructions, no Special Master was appointed. See *Connor* v. *Coleman,* 425 U. S. 675, 676 (1976). In April 1973, over a year after our judgment had issued, the Mississippi Legislature enacted a new reapportionment. The plaintiffs immediately filed objections to the plan on April 18. Almost two years later, in February 1975, the District Court finally held a hearing on those objections. While its decision was pending, the court learned that the legislature was considering revisions to the statutory plan. "Heeding the teachings" of *Chapman* v. *Meier,* 420 U. S. 1 (1975), that reapportionment is primarily the responsibility of state legislatures, the District Court further delayed its decision for the expected legislative action. *Connor* v. *Waller,* 396 F. Supp. 1308, 1311 (1975). When the legislature finally acted in April 1975, the court dismissed the plaintiffs' complaint and directed them to file an amended complaint addressing the new reapportionment. *Ibid.* The plaintiffs filed their complaint, and the court entered judgment essentially approving the 1975 legislative plan. *Id.,* at 1332.

In June 1975, this Court summarily and unanimously reversed. *Connor* v. *Waller,* 421 U. S. 656. We held that the Mississippi reapportionment Acts "are not now and will not be effective as laws until and unless cleared pursuant to § 5" of the Voting Rights Act. *Ibid.* Relying on the unambiguous holdings of *Allen* v. *State Board of Elections,* 393 U. S. 544 (1969), and *Perkins* v. *Matthews,* 400 U. S. 379 (1971), we ruled that the District Court had erred in deciding the constitutional challenges to the Acts. Under these cases, the only inquiry open to the court was whether § 5 covered a state enactment that had not received the requisite federal scrutiny. 400 U. S., at 383–384; 393 U. S., at 558–561. *Georgia* v. *United States,* 411 U. S. 526 (1973), clearly had held that § 5 encompasses reapportionment Acts, and the Mississippi Act clearly had not been submitted for § 5 clearance. Particularly because two members of the District Court were also on the court that had been reversed in *Perkins* for overstepping the inquiries permitted by § 5, see *Perkins* v. *Matthews,* 301 F. Supp. 565 (SD Miss. 1969), the District Court's undertaking to resolve the constitutionality of this statute was inexcusable.

Our opinion also authorized the District Court to impose a court-ordered reapportionment if it became appropriate to do so. 421 U. S., at 657. Four days after this decision, on June 9, 1975, Mississippi submitted the 1975 Acts to the Attorney General pursuant to § 5. The Attorney General immediately interposed his objection, thereby foreclosing implementation of the plan, on the ground that the State had not demonstrated the absence of a discriminatory purpose or impact. Consequently, the District Court held hearings, and determined that there was insufficient time to formulate a final plan before the August 1975 primary. It therefore adopted a temporary plan that was substantially similar to both the 1971 court-ordered plan previously vacated by this Court and the 1975 legislative plan challenged by the Attorney General. And, once again, despite our admonitions in *Connor*

v. *Johnson,* 402 U. S., at 692, and *Connor* v. *Williams, supra,* at 551, the court's plan relied heavily on multimember districts.[1]

In imposing these temporary measures, the District Court professed its intent to avoid unnecessary delay in preparing a permanent plan for the 1979 state elections. The court's actions, however, belied that representation. On August 1, 1975, the court refused to establish a deadline for approval of a final plan, although it articulated "its firm determination to have this matter out of the way before February 1, 1976." App. to Pet. for Mandamus in *Connor* v. *Coleman,* O. T. 1975, No. 75–1184, p. 4a. On January 26, 1976, the United States moved to set February 10, 1976, as the date for a hearing on the permanent plan. The court, however, denied the motion and deferred further deliberations until this Court decided three pending cases involving reapportionment issues. See *Connor* v. *Coleman,* 425 U. S., at 678.[2]

On May 19, 1976, after two of the three cases had been decided, we allowed the plaintiffs to file a petition for a writ of mandamus, and directed the District Court to

"carry out the assurance given in its order of January 29, 1976 to 'bring this case to trial forthwith . . .' and schedule a hearing to be held within 30 days on all proposed permanent reapportionment plans to the end of entering a final judgment embodying a permanent plan reapportioning the Mississippi Legislature in accordance with law to be applicable to the election of legislators in the 1979 quadrennial elections, and also ordering any necessary special elections to be held to coincide with the

---

[1] Forty-two of eighty-four house districts and 14 of 39 senate districts were multimember. Brief for United States in *Connor* v. *Coleman,* O. T. 1975, No. 75–1184, p. 9.

[2] The three cases were *United Jewish Organizations* v. *Carey,* 430 U. S. 144 (1977), *Beer* v. *United States,* 425 U. S. 130 (1976), and *East Carroll Parish School Board* v. *Marshall,* 424 U. S. 636 (1976).

November 1976 Presidential and congressional elections, or in any event at the earliest practicable date thereafter." *Id.,* at 679.

The District Court thereupon held the required hearing and entered a judgment adopting a final plan.

This Court reversed the judgment on direct appeal, finding that the plan "fail[ed] to meet *the most elemental requirement* of the Equal Protection Clause in this area—that legislative districts be 'as nearly of equal population as is practicable.'" *Connor* v. *Finch,* 431 U. S., at 409–410 (citations omitted; emphasis added). In spite of our previous holding that court-ordered reapportionment plans ordinarily must achieve population equality with only *de minimis* variation,[3] our invalidation of legislative reapportionments with variations of 5.97%, and 13.1%,[4] and our strong suggestion in *Connor* v. *Williams,* 404 U. S., at 550, that variations near 20% were unacceptable, the District Court's plan countenanced maximum population deviations of 16.5% in the senate districts and 19.3% in the house districts. While the District Court had justified these excessive deviations as preservative of existing political boundaries, this Court found that the plaintiffs had submitted an alternative plan that better served the state policy against fragmenting county boundaries and came closer to achieving population equality. 431 U. S., at 420. Moreover, we observed that

"unexplained departures from the results that might have been expected to flow from the District Court's own neutral guidelines can lead, as they did here, to a charge that the departures are explicable only in terms of a

---

[3] *Chapman* v. *Meier,* 420 U. S. 1, 26–27 (1975).

[4] *Kirkpatrick* v. *Preisler,* 394 U. S. 526 (1969); *Wells* v. *Rockefeller,* 394 U. S. 542 (1969). Of course, legislative apportionments are entitled to greater deference than court-ordered plans. *Connor* v. *Finch,* 431 U. S. 407, 415 (1977); *Wise* v. *Lipscomb,* 437 U. S. 535, 541 (1978).

purpose to minimize the voting strength of a minority group." *Id.*, at 425.

Without stating explicitly whether such charges were justified, we directed the court to draw legislative districts that were "reasonably contiguous and compact . . . or explain precisely why in a particular instance that goal cannot be accomplished." *Id.*, at 425–426. Finally, we insisted in no uncertain terms that the District Court resolve this litigation forthwith, stating:

> "The task facing the District Court on remand must be approached not only with great care, but with a compelling awareness of the need for its expeditious accomplishment, so that the citizens of Mississippi at long last will be enabled to elect a legislature that properly represents them." *Id.*, at 426.

On remand, the parties submitted proposed plans to the District Court. A trial began on November 21, 1977, and concluded on February 14, 1978. Approximately two months later, in April 1978, the Mississippi Legislature enacted a new reapportionment plan, which was filed with the Attorney General. The Attorney General registered his objection on July 31, 1978, and the next day, the State brought suit in the District Court for the District of Columbia seeking a declaratory judgment that the apportionment Act did not have a discriminatory purpose or effect.

Meanwhile, in May 1978, a Special Master previously appointed by the court below filed a final plan. The court ordered a settlement conference in June, and a plan was developed on which all parties agreed.[5] On August 2, however, the defendants filed a motion, opposed by the other

---

[5] The Joint Apportionment Committee of the Mississippi Legislature polled both houses and determined that a substantial majority of legislators favored the settlement plan if the statutory plan did not receive § 5 clearance. Pet. for Mandamus 10.

parties, to stay the proceedings until the conclusion of the § 5 litigation. Thereafter, in September, the negotiations broke down when the State insisted that the parties agree not to introduce the settlement plan as evidence before the D. C. court.

On October 12, 1978, the plaintiffs requested the District Court to enter final judgment implementing the settlement plan. At a hearing on November 29, 1978, the court, relying on *Wise* v. *Lipscomb,* 437 U. S. 535 (1978), stated it would "not *rush in* with a court-ordered plan . . . when a legislative plan [was] pending." Tr. 3–4 (emphasis added). The court therefore set no deadlines for disposition of the plans before it. When counsel observed that *Connor* v. *Finch,* 431 U. S., at 426, required expeditious action, the District Court appeared to conclude that the intervening actions of the Mississippi Legislature had somehow dissolved the mandate of this Court. Tr. 11–12.

The District Court reiterated at a hearing on January 2, 1979, that "purely on the authority of *Wise* v. *Lipscomb,* . . . we've been waiting to see what the District Court in the District of Columbia would do about the legislative plan." *Id.,* at 7. In their response to petitioners' motion, the judges of the District Court have assured us that if the D. C. court has not acted by May 7, 1979, 31 days before the June 7 filing deadline for the primary elections, they will implement a court-ordered plan.

However, even assuming the District Court met its May 7 deadline, the delay would effectively preclude meaningful review by this Court prior to the August primaries. Given the "painfully protracted" course of this litigation, *Connor* v. *Finch, supra,* at 410, and the dismal record of the District Court, I believe that foreclosing appellate review of its plan before the 1979 primary elections would simply afford the District Court another opportunity to disregard our mandates. Furthermore, the District Court's justifications for its latest

procrastination are as unfounded as those it has previously invoked to evade its judicial responsibilities.

*Wise* v. *Lipscomb* provides no excuse for ignoring our express directive in *Connor* v. *Finch, supra.* To be sure, MR. JUSTICE WHITE's opinion in *Lipscomb,* which was joined by MR. JUSTICE STEWART, noted that a federal court should give a state legislature a "reasonable opportunity" to fashion an acceptable plan before formulating one itself. 437 U. S., at 540. But this was no novel legal principle. Indeed, the District Court had relied on a similar statement in *Chapman* v. *Meier,* 420 U. S., at 27, when it stayed the proceedings in 1975 and then approved the legislature's plan. See *supra,* at 616. Especially in light of this prior deference, the Mississippi Legislature has had a reasonable opportunity to formulate an acceptable plan over the 13 years of this litigation. In any case, implementation of a court-ordered plan at this point will effect a minimal intrusion on state prerogatives. The legislators have already indicated their provisional approval of the settlement plan, which is one of the options available to the court. See n. 5, *supra.* And, if the D. C. court sustains the legislature's reapportionment, that plan, unless stayed by this Court pending appeal, would supersede whatever plan the Mississippi District Court imposes and would govern the 1979 election. The District Court could easily minimize any inconvenience in the transition by implementing the settlement plan, which largely tracks the 1978 statutory reapportionment with respect to the majority of the legislative districts. Pet. for Mandamus 10 n. 2; Reply Brief for Petitioners 2–3.[6] Moreover, any administrative difficulties would not justify imposition of another temporary, constitutionally infirm plan, as occurred in previous elections.

Nor is there merit to the suggestion that the federal court will exceed its judicial function by formulating a plan before

---

[6] Significant differences remain, however, regarding the number of Negro majority districts under the respective plans. *Id.,* at 10–11, n. 2.

resolution of the § 5 litigation. The argument disregards, as the District Court apparently did, MR. JUSTICE WHITE's statement in *Lipscomb:*

"Legislative bodies should not leave their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the 'unwelcome obligation,' *Connor* v. *Finch, supra,* at 415, of the federal court to devise and impose a reapportionment plan pending later legislative action.

.     .     .     .     .

". . . A new reapportionment plan enacted by a State, including one purportedly adopted in response to invalidation of the prior plan by a federal court, will not be considered 'effective as law' . . . until it has been submitted and has received clearance under § 5. . . . Pending such submission and clearance, if a State's electoral processes are not to be completely frustrated, federal courts will at times necessarily be drawn further into the reapportionment process and required to devise and implement their own plans." 437 U. S., at 540, 542.

Awaiting the D. C. court's decision could well frustrate the State's electoral processes. Such a course would deny the plaintiffs and the United States an opportunity before the primary elections to have us review the reapportionment plan of a court that has proved demonstrably reluctant to follow our decisions. To permit this delay would further compromise the rights of Mississippi voters by requiring that special elections for vacancies be conducted under ad hoc adaptations of the court's invalid 1975 plan. See, *e. g.,* Brief for United States 14; Reply Brief for Petitioners 2 n. 2.

I believe that the District Court's reliance on *Wise* v. *Lipscomb* is a transparent attempt to avoid the unequivocal command of this Court. Such intransigence, particularly after

13 years of malfeasance, warrants extraordinary sanctions. As we have previously held:

> "When a lower federal court refuses to give effect to, or misconstrues our mandate, its action may be controlled by this court, either upon a new appeal or by writ of mandamus. . . . It is well understood that this court has power to do all that is necessary to give effect to its judgments." *Baltimore & Ohio R. Co.* v. *United States,* 279 U. S. 781, 785 (1929).

Accord, *United States* v. *Haley,* 371 U. S. 18 (1962).

The petition should be granted and mandamus should issue forthwith.