FEBRUARY 19, 1980

No. 79–504. UNITED STATES ET AL. *v.* MISSISSIPPI; and

No. 79–528. HENRY ET AL. *v.* MISSISSIPPI. Affirmed on appeal from D. C. D. C. Reported below: 490 F. Supp. 569.

MR. JUSTICE STEVENS, concurring in the judgment.

In 1965, a three-judge District Court was convened in Mississippi to deal with allegations of malapportionment in Mississippi's State Legislature. By 1975, an acceptable reapportionment plan still had not been formulated; nevertheless, quadrennial elections were held under a court-ordered plan.[1] In 1978, the Mississippi Legislature enacted a statutory reapportionment plan, which was submitted to the Attorney General of the United States for preclearance under the Voting Rights Act of 1965, 79 Stat. 437, as amended, 42 U. S. C. § 1973 *et seq.* When the Attorney General objected to the plan, the State brought this action in a three-judge District Court in the District of Columbia, seeking a declaratory judgment that the plan was in compliance with the Act. In 1979, while the Voting Rights Act case was still pending, the three-judge court in Mississippi entered a judgment putting into

---

[1] The history of that litigation is described at length in MR. JUSTICE MARSHALL's dissenting opinion in *Connor* v. *Coleman,* 440 U. S. 612, 614.

effect a reapportionment plan agreed to by all parties. *Connor* v. *Finch,* 469 F. Supp. 693 (SD Miss.). That plan was essentially a modified version of the statutory plan.

Under the Voting Rights Act the task confronting the District of Columbia court was to determine whether the statutory plan had the purpose or effect of denying or abridging the right to vote on account of race or color. 42 U. S. C. § 1973c. An impermissible effect is created whenever a reapportionment plan has the effect of diluting existing black voting strength. See *Beer* v. *United States,* 425 U. S. 130, 141. The District of Columbia court compared the statutory reapportionment plan to the 1979 court-ordered plan in order to determine whether any prohibited retrogression had occurred. Concluding that it had not and that there was no purpose to discriminate evident in the statutory plan, the court granted the State a declaratory judgment approving the plan. Both the United States and intervenors (black voters in Mississippi) appealed. The Court today affirms, without opinion.

In my judgment the only significant issue presented on appeal is whether the statutory plan had the impermissible effect of diluting black voting strength. In his dissenting opinion MR. JUSTICE MARSHALL presents a persuasive case that there were significant discrepancies between the statutory plan and the 1979 court-ordered plan. Because I believe that the 1979 plan was not the proper benchmark to be used in determining whether there was an impermissible effect, I have no occasion to comment on his conclusion that the differences between the two plans were sufficient to constitute a "dilution" of black voting strength.

As a technical matter, the court-ordered plan was the plan "in effect" at the time the District of Columbia court decided the case.[2] Nevertheless, all of the parties to both actions realized that the statutory plan would be used in the 1979

---

[2] The statutory plan could not become effective until it was cleared pursuant to the Voting Rights Act by either the Attorney General or the three-judge court in the District of Columbia. *Connor* v. *Waller,* 421

elections if it received court approval in time.  See *Connor* v. *Coleman,* 440 U. S. 612, 622 (MARSHALL, J., dissenting).  Thus, in practical terms, the court-ordered plan was never more than a backup.  To use such a plan as a benchmark for judging the effect of the statutory plan on voting rights seems to me to be logically indefensible.  No voting rights in Mississippi were ever affected by the backup plan and thus any "changes" due to the imposition of the statutory plan could hardly have diluted those rights.  Moreover, to require a state legislature to predict what court-ordered plans may be entered while a Voting Rights Act suit is pending and then to draw its plan to ensure that no dilution occurs seems to me to be a futile exercise clearly not required by the statute.

Thus, in my view the statutory plan was permissible under the Act so long as it did not have a discriminatory purpose and did not dilute black voting strength as it existed at the time the legislation was passed.  The District Court's findings of fact make it clear that the plan met these conditions.[3]  I therefore concur in the judgment affirming the decision of the court below.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE WHITE join, dissenting.

For more than 15 years private litigants, often joined by the United States, have sought to obtain an apportionment

---

U. S. 656.  The judgment entered by the Mississippi court, on the other hand, specifically provided that the court-ordered plan was to be in "full force and effect for the 1979 regular state legislative elections and thereafter unless and until altered according to law."  *Connor* v. *Finch,* 469 F. Supp. 693, 694 (SD Miss. 1979).  Thus, the court-ordered plan would have remained in effect if the District of Columbia court had not approved the statutory plan.

[3] The court noted that when compared to the 1975 apportionment plan that had governed the last elections, the statutory plan constituted a "clear enhancement of the position of racial minorities with respect to their effective exercise of the electoral franchise. . . ."  App. to Juris. Statement in No. 79–504, p. 32a, n. 6.

plan in Mississippi which satisfies the requirements of the Equal Protection Clause and the Voting Rights Act of 1965. By today's summary affirmance, the Court assures that these efforts will remain to a substantial degree unsuccessful. I dissent.

## I

Brought in 1965, this case has a procedural history that can charitably be described as bizarre. Both state officials and the three-judge District Court for the Southern District of Mississippi have shown a firm determination to avoid implementation of an apportionment plan which complies with constitutional and statutory requirements.[1] The case has been before this Court no fewer than eight times; we have invalidated plans proposed by the District Court on four occasions. *Connor* v. *Johnson,* 402 U. S. 690 (1971); *Connor* v. *Williams,* 404 U. S. 549 (1972); *Connor* v. *Waller,* 421 U. S. 656 (1975); *Connor* v. *Finch,* 431 U. S. 407 (1977).

In *Connor* v. *Finch,* we ordered the District Court to draw a lawful apportionment plan "with a compelling awareness of the need for its expeditious accomplishment, so that the citizens of Mississippi at long last will be enabled to elect a legislature that properly represents them." *Id.,* at 426. Two more years passed, and no such plan was drawn. When the case was here last Term, the plaintiffs sought leave to file a petition for a writ of mandamus to require the District Court to do what we have ordered. On March 26, 1979, the Court granted leave to file the petition, but it postponed action for 30 days, instructing the District Court to enter a plan "forthwith and without further delay." *Connor* v. *Coleman,* 440 U. S. 612, 614.[2] On April 13, 1979, the District Court entered a final judgment embodying a plan agreed to by all

---

[1] The procedural background is described in detail in my dissenting opinion in *Connor* v. *Coleman,* 440 U. S. 612, 614–621 (1979).

[2] I would have issued the writ immediately. See *Connor* v. *Coleman, supra,* at 614 (dissenting opinion).

parties.[3]   Unfortunately, this settlement plan did not end the litigation.

Almost a year earlier, on April 21, 1978, the Governor of Mississippi had approved a statutory reapportionment plan designed to supersede any court-ordered plan to be produced in this litigation.   The statutory plan was submitted to the Attorney General of the United States for preclearance under the Voting Rights Act of 1965, 42 U. S. C. § 1973 *et seq.*   On July 31, 1978, the Attorney General entered a timely objection on the ground that the State had failed to carry its burden of proving the absence of a discriminatory purpose or effect. See 42 U. S. C. § 1973c.   The State of Mississippi filed the present action in the United States District Court for the District of Columbia, seeking a declaratory judgment under the Voting Rights Act that the statutory plan did not have the prohibited purpose or effect.   Ten Mississippi Negro voters intervened, urging that the statutory plan be declared invalid. On June 1, 1979, the District Court entered the declaration requested by the State, and it is that judgment which is the subject of the present appeal.

## II

The legality of the statutory plan depends on whether it has the purpose or effect of diluting Negro voting strength in Mississippi.   If the statutory plan is retrogressive, it is forbidden under the Voting Rights Act.   *Beer* v. *United States,* 425 U. S. 130 (1976).   The District Court correctly measured the statutory plan against the present apportionment of the Mississippi Legislature, which is the settlement plan embodied in the final judgment entered by the District Court for the

---

[3] The petition for a writ of mandamus was denied on May 21, 1979, *Connor* v. *Coleman,* 441 U. S. 792; we noted that the Clerk of the District Court had "stated that all parties to the litigation have announced in open court that there will be no appeal." *Ibid.*

Southern District of Mississippi in response to our instruction to enter a plan "forthwith and without further delay." [4]

The District Court's findings reveal a long history of denial of Negro voting rights in Mississippi. Official use of racially discriminatory devices such as literacy tests, poll taxes, and white primaries effectively excluded Negroes from participation in the electoral process until the passage of the Voting Rights Act in 1965. The current effects of past discrimination are manifested in serious underrepresentation of Negroes in the state legislature. Although the latest census showed that Mississippi's population is 36.8% Negro, prior to the 1979 elections there were only four Negroes in the 122-member House of Representatives and none in the 52-member Senate. Because of racial bloc voting and low Negro voter registration and turnout, Negroes must constitute a substantial majority of citizens in a district in order to have a reasonable opportunity to elect a candidate of their choice. The court concluded that either a Negro population of 65% or a Negro voting age population of 60% was necessary to provide such an opportunity.

---

[4] The argument that retrogression should be measured against the 1975 court-ordered plan which was in effect when the legislature adopted the statutory plan is manifestly incorrect. The mandate of the Voting Rights Act is that a plan may not be adopted if it would dilute existing Negro voting strength. There is no dispute that the 1979 court-ordered plan was the governing law at the time the court below rendered its decision. If the statutory plan were not put into effect, future elections would be conducted under the court-ordered plan. Accordingly, it is simply incorrect to suggest that Negro voting rights were not "affected" by the 1979 court-ordered plan or that a subsequent statutory plan could not dilute the rights won under that plan. To suggest, as does MR. JUSTICE STEVENS, *ante,* p. 1050, that the court-ordered plan that is now the law in Mississippi may be disregarded because the parties viewed it as a mere "backup" not only denigrates a final judgment of a federal court, entered at our direction after over a decade of litigation; it would also permit a state legislature freely to dilute Negro voting strength gained through any court-ordered plan under which elections had not yet been held. Such a result is plainly contrary to the Voting Rights Act.

It is evident from the findings of the District Court that the statutory plan significantly weakens the voting strength of Negroes in a number of ways. The statutory plan divides and diminishes Negro population concentrations, combines them with heavily white populations, and creates oddly shaped districts for no apparent reason other than to dilute the Negro vote. Under the plan presently in effect, 49 districts contain a majority of Negro voters; the statutory plan contains only 46 such districts. As the District Court acknowledged, under "the statutory plan's redistricting of Warren County, a heavy black population concentration is divided among three proposed house districts, turning a black majority into a black minority in all three districts." App. to Juris. Statement in No. 79–504, pp. 18a–19a.

The court concluded that the elimination of three majority districts was insignificant, relying on its finding that a Negro voting-age population of 60% was necessary in order for Negroes to have a fair opportunity to elect a candidate of their choice. Apparently the court reasoned that the diminution in the number of districts with a mere majority of Negro voters was not retrogressive since even under the plan presently in effect, Negro voters in those districts could not elect candidates. But a majority population gives Negroes at least some opportunity to elect a candidate of their choice; a minority gives them practically none. Indeed, in some of the counties with Negro majorities under the existing plan but not under the statutory plan, Negroes have been extremely active in city government and have a genuine opportunity to elect a candidate of their choice.[5] The District Court's mechanical application of the 60% standard eliminates that opportunity.

In a number of other districts appellee failed to carry

---

[5] For example, in the Warren County district the community of Vicksburg has recently elected a Negro to the City Council. In addition, Bolton and Edwards, primarily Negro towns in the Hinds County district, have predominantly Negro city governments.

its burden of disproving retrogression within the meaning of *Beer*. In Leflore County, for example, existing law provides for a Negro voting-age population of 71.72%; the statutory plan reduces that population to 64.26%. The statutory plan fragments a heavily Negro population in that county, combining the larger portion with a white community. The record showed that because of past discrimination, Negro voting strength was severely inhibited in the county, in part because most Negroes reside in rural areas, where voter turnout is far less than in urban districts. There was testimony that a 65% Negro voting-age population substantially composed of rural Negroes was insufficient to provide a fair opportunity to elect candidates. By contrast, the 71.72% population provided by the existing plan is fully adequate.

The District Court's findings show that the statutory plan fragments a number of cohesive voting districts, combining communities where Negroes have been politically active with white populations for no discernible reason. There was uncontradicted testimony that in seven districts, the statutory plan deprives Negro voters of an opportunity to elect a candidate of their choice.[6] In these circumstances, I am unable to accept

---

[6] For example, in western Hinds County, a heavily Negro district under the present law is divided into three sections, each of which is combined with greater white populations in surrounding suburbs. In Marshall County, the only district that has elected a Negro supervisor is split up, and the voting strength of Negro voters in the county's House district is diluted by the inclusion of the predominantly white Holly Springs precinct. The county's Negro voting population is thus reduced from 62% to 56%. In Adams County, the statutory plan divides the only supervisors' district with a majority Negro population into two districts. The northern portion of Adams County is then combined with heavily white populations, which reduces the Negro population from almost 70% to 63%.

The District Court altogether ignored the retrogression in the electoral strength of Negro voters within the counties. This was a serious error, for county delegations to the Mississippi Legislature play a crucial role in local government. Legislation affecting the county is enacted by a scheme

the conclusion that the statutory plan would not lead to a retrogression in the position of Negro voters.

The District Court acknowledged these differences between the two plans, but upheld the statutory plan nonetheless, concluding that the differences were insufficient to constitute a discriminatory effect. The court pointed out that both plans had the same number of districts with Negro voting-age populations of 60% or more, and it relied heavily on "the fact that legislative reapportionment is the preferred vehicle for reapportionment, as is reflected by the broader tolerances which are allowed to legislatures, but not to courts, in the matter of deviations from uniform population requirements." App. to Juris. Statement in No. 79–504, p. 32a.[7] It also relied on findings that the intervenors had not offered sufficient objections during the formulation of the statutory plan.

The District Court's reasoning amounts to a conclusion that there is a *de minimis* exception to the fundamental proposition that changes may not be made if they would produce a retrogression in the electoral potential of Negro voters. *Beer* v. *United States*, 425 U. S. 130 (1976). I am unable to dis-

---

of bills of local application in the state legislature; boards of supervisors exercise little legislative power. As a result, the county delegation is largely responsible for local governance. If the statutory plan is viewed from the perspective of particular counties, it is even more difficult to account for the District Court's finding that any retrogression was "insignificant."

[7] The court also found that the State had carried its burden of proving that the statutory plan was not the product of a discriminatory intent, a conclusion that is in my view highly questionable. The unexplained discriminatory elements of the statutory plan, when combined with the State's prior history of discrimination, suggest that the State had not carried its burden. Indeed, the court entirely ignored testimony tending to show that members of the state legislature's joint reapportionment committee were aware that the statutory plan dilutes the strength of the Negro vote and that alternative configurations would preserve existing Negro population concentrations.

cern such an exception in the Voting Rights Act or in any of our decisions. Such a gloss on the Act would invite a series of changes, seemingly insignificant in themselves, which over the course of years could result in a substantial decline in Negro voting strength. Nor is the decision below justified by the principle that legislatures may deviate more broadly than courts from uniform population requirements. The Voting Rights Act flatly prohibits state legislatures from " 'undo[ing] or defeat[ing] the rights recently won' by Negroes." *Beer* v. *United States, supra,* at 140. Finally, the asserted failure of the intervenors to offer sufficient objections to the statutory plan is wholly irrelevant to the inquiry required by the Voting Rights Act. The Act's proscription on retrogression is simply not subject to waiver. The District Court's conclusion would permit a State freely to dilute Negro voting strength whenever the Negro community is unable or unwilling to participate in the apportionment process.

By today's summary affirmance, the Court permits the rights won less than a year ago, after generations of political efforts and well over a decade of litigation, to be thwarted by recalcitrant state officials. In so doing, the Court appears to condone a novel interpretation of the law that would find a *de minimis* exception to the clear and absolute requirements of the Voting Rights Act, and sanctions the application of this new doctrine to a case in which, as the record amply demonstrates, the dilution of Negro voting strength is not *de minimis* at all, but substantial. The plan approved today ensures that the Negro voters of Mississippi will not yet obtain an apportionment plan which meets the requirements of the Act. I dissent.