David JORDAN and Sammie Chestnut, On Behalf of the Greenwood Voters League, Individually and on Behalf of others similarly situated, Plaintiffs,

v.

William WINTER, Governor of Mississippi; T. H. Campbell, III, Chairperson, Bill Harpole, Vice-Chairperson, J. C. "Con" Maloney, Secretary, Joint Congressional Redistricting Committee; Brad Dye, Lieutenant Governor of Mississippi and President of the Senate; and Clarence B. "Buddie" Newman, Speaker of the House of Representatives, Defendants.

Owen H. BROOKS, Sarah H. Johnson, Rev. Harold R. Mayberry, Willie Long, Robert E. Young, Thomas Morris, Charles McLaurin, Samuel McCray, Robert Jackson, Rev. Carl Brown, June E. Johnson, and Lee Ethel Henry, individually and on behalf of all others similarly situated, Plaintiffs,

v.

William F. WINTER, Governor of Mississippi, William A. "Bill" Allain, Attorney General of Mississippi, Edwin Lloyd Pittman, Secretary of State of Mississippi, in their official capacities and as members of the Mississippi State Board of Election Commissioners, Mississippi Democratic Executive Committee, Mississippi Republican Executive Committee, Defendants.

Nos. GC 82–80–WK–O, GC 82–81–WK–O.

United States District Court, N. D. Mississippi, Greenville Division.

June 8, 1982.

Frank R. Parker, Washington, D. C., Johnnie E. Walls, Jr., Greenville, Miss., Robert Bruce McDuff, Memphis, Tenn., for plaintiffs.

Bill Allain, Atty. Gen., Jackson, Miss., for defendants.

Before CLARK, Circuit Judge, and KEADY and SENTER, District Judges.

PER CURIAM:

Plaintiffs bring class actions on behalf of Mississippi residents and registered voters and the state's black residents and voters to (1) enjoin enforcement of the state's 1981 congressional redistricting plan until it is precleared under § 5 of the Voting Rights Act (42 U.S.C. § 1973c); (2) prohibit further use of Miss.Code Ann. § 23–5–223 (1972), the state's existing congressional plan, because of population malapportionment allegedly violative of Art. 1, § 2 and the fourteenth amendment to the United States Constitution; and (3) secure a court-ordered plan for the 1982 elections for members of the United States House of Representatives, and thereafter until changed by law. Defendants are the state's governor, attorney general, secretary of state, state board of election commissioners and the Republican and Democratic state executive committees which are responsible for conducting the primary and general elections for the United States House of Representatives in Mississippi.

The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C.

§ 1973j(f), and a three-judge district court has been properly convened pursuant to 28 U.S.C. § 2284.

In August 1981 the Mississippi Legislature enacted S.B. 2001, also known as 1981 Mississippi Laws (Extraordinary Sess.) Ch. 8, for redistricting the state's five congressional districts and thereafter submitted it to the Attorney General of the United States for § 5 preclearance. After requesting additional information, the Attorney General interposed timely objection on March 30, 1982. Although the state legislature was in session when the objection was received, it adjourned several days later without enacting another plan or further attempting to obtain preclearance from the Attorney General. Instead, on April 7, the state filed a declaratory judgment action in the United States District Court for the District of Columbia, seeking judicial preclearance of S.B. 2001. *Mississippi v. Smith*, No. 82–0956. This court has been notified that the declaratory judgment action, in which plaintiffs have intervened, will not be heard until mid-July. Since by Mississippi law, the 1982 congressional primaries were set for June 1 with runoff primary June 22, this court on April 26 found it necessary to order indefinite postponement of the current year's congressional primary pending expedited hearing on issues relevant to formulation of an interim court-ordered plan.

The parties are in agreement that the present circumstances require the court to adopt an interim redistricting plan effective until S.B. 2001 is precleared or an alternate plan is enacted by the state legislature and precleared under § 5. Admittedly, Mississippi is a covered jurisdiction under § 5 of the Voting Rights Act, and S.B. 2001 is a change in standards, practices or procedures with respect to voting within the meaning of § 5. The parties, however, vigorously disagree on what plan should be adopted by the court as an interim congressional redistricting plan.

During a two-day hearing on May 13 and 14, the court received stipulations, oral and documentary evidence and heard oral argument. Briefs of all concerned parties having been filed, we incorporate herein findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P.

### I.

According to the 1980 official census, Mississippi has a total population of 2,520,638, of which approximately 35% are black. Since the state elects five members of the United States House of Representatives, the norm, or ideal population size for a congressional district is 504,128. Because of notable population shifts that have occurred throughout the state since 1970, the districts formed by the existing 1972 plan have a total population variance of 17.6%. The following table reflects the 1980 population, existing extent and percent of deviation, and percentage of minorities in the five 1972 districts:

| Dist. No. | Total Pop. | Deviation | % Deviation | Black % |
|---|---|---|---|---|
| 1 | 495,709 | 8,419 | − 1.67 | 29.90 |
| 2 | 460,780 | 43,348 | − 8.60 | 45.25 |
| 3 | 514,218 | 10,090 | + 2.00 | 37.87 |
| 4 | 500,329 | 3,799 | − 0.75 | 45.37 |
| 5 | 549,602 | 45,474 | + 9.02 | 19.78 |

In recognition of this disparity, the legislature in 1980 established a joint Senate-House Committee for Congressional Redistricting (Joint Committee), chaired by Representative Thomas H. Campbell, III, which converted census population data into the state's election precincts, conducted eight public hearings around the state and received the views and proposals of interested groups and individuals. Included among the submitted proposals were a number of plans advocated by legislators and citizens

of both races. The plans submitted by blacks proposed joining the black majority counties in the northwest portion of the state known as the "Delta area" to other territory to create a black majority district, ranging from 52.1% to 65.81%.[1]

The Joint Committee recognized that the population variances had to be eliminated, but a majority of its members concluded this could be satisfactorily accomplished without diluting black voting strength by rearranging district lines to avoid incumbent congressmen from running against each other and by transferring only six counties and portions of four counties across district lines. Although Mississippi's congressional districting plans from 1882 to 1966 had contained a district encompassing most of the Delta counties, the committee did not feel obligated to voluntarily create a black majority district with a configuration different from the 1972 lines that had been previously precleared.[2]

The record further reflects that the Joint Committee disapproved any major change of the district lines and recommended a plan, the essence of which was enacted by the legislature as S.B. 2001, which achieved a population variance of .0422 by splitting four counties into adjacent districts (K–27). The stipulated data as to the total population, deviation, percentage of deviation, and percentage of total minority population[3] in the S.B. 2001 districts follow:

| District | Total Population | Deviation | % Deviation | Black % |
|---|---|---|---|---|
| 1 | 504,107 | − 21 | − .0042 | 29.79 |
| 2 | 504,024 | − 104 | − .0206 | 47.95 |
| 3 | 504,237 | + 109 | + .0216 | 33.38 |
| 4 | 504,123 | − 5 | − .0010 | 45.32 |
| 5 | 504,147 | + 19 | + .0038 | 19.54 |

S.B. 2001 was objected to by the Attorney General on the ground it divided the black majority Delta and part-Delta counties among Districts 1, 2 and 3 rather than concentrating them in a single district and concluded there had been unlawful dilution of minority voting strength.[4] The Attorney General was of the view that the legisla-

1. The Mississippi Delta consists of 19 Delta and part-Delta contiguous counties as follows: Bolivar, Carroll, Coahoma, DeSoto, Grenada, Holmes, Humphreys, Issaquena, Leflore, Panola, Quitman, Sharkey, Sunflower, Tallahatchie, Tate, Tunica, Warren, Washington, and Yazoo. This is a distinct geographical area of the state traditionally featuring an agricultural economy concerned with flood control of the Mississippi River. The geography of the Delta has been colorfully and somewhat accurately described as "beginning in the lobby of the Peabody Hotel at Memphis, Tennessee, and ending at Catfish Row in Vicksburg, Mississippi." Since early times, concentrations of blacks have resided in the Delta area. In fact, of the 21 black majority counties in Mississippi, 14 are located in the Delta.

2. In 1966, the legislature first adopted a plan dividing the north and north-central portions of the state by drawing east/west lines generally across the state which segmented black majority Delta counties into three districts. Civil rights plaintiffs' challenge of the plan as a racial gerrymander violative of the fifteenth amendment was turned down in Connor v.

Johnson, 279 F.Supp. 619 (S.D.Miss.1966), aff'd. 386 U.S. 483, 87 S.Ct. 1174, 18 L.Ed.2d 224 (1967). The 1966 plan was in fact never submitted and precleared in accordance with § 5. In 1972, the legislature substantially reenacted the 1966 plan, adjusting only for population variances. On May 10, 1972, the Attorney General precleared the 1972 act, which was utilized without challenge for five congressional elections.

3. Black voting age population is approximately 5% lower than total population figures.

4. The Attorney General's objection letter stated in part:
 Our analysis shows that, according to 1980 Census data, the State is authorized five congressional districts and has a population which is 35.2 percent black. The black population in large part still is concentrated in the Delta region. District Nos. 1, 2 and 3 of the reapportionment plan have been drawn horizontally across the majority-black Delta area in such manner as to dismember the black population concentration and effectively dilute its voting strength.

ture's reliance upon the 1972 precleared plan was misplaced, and stated that while no objection to the 1972 plan was timely interposed, this was the result of an erroneous determination by his office that the Supreme Court's summary affirmance in *Connor v. Johnson*, 386 U.S. 483, 18 L.Ed.2d 224 (1967), was entitled to deference as to the § 5 issues.

Since it is apparent that the population deviations in congressional districts can be easily alleviated, the essence of the dispute centers around claims of dilution of black voting strength. Plaintiffs urge the court to adopt an interim plan with one district containing approximately 65% black majority population. To achieve this purpose, they have submitted two proposals, both of which were devised by Senator Henry J. Kirksey, a black legislator. The primary Kirksey plan (K–30) has a 64.37% black majority district and a total population variance of .2150%. This plan splits five counties, including populous Hinds County, from which a portion of the City of Jackson is combined with 14 Delta and part-Delta counties or segments thereof and with additional counties to form the black majority district. The following table presents the data concerning this plan.

| District | Total Population | Deviation | % Deviation | % Blacks |
|---|---|---|---|---|
| 1 | 504,219 | + 92 | + .0182 | 25.60 |
| 2 | 503,436 | − 691 | − .1371 | 64.37 |
| 3 | 504,530 | + 403 | + .0799 | 32.49 |
| 4 | 504,035 | − 92 | − .0182 | 33.83 |
| 5 | 504,418 | + 291 | + .0577 | 19.75 |

The "fall-back" Kirksey plan (P. Ex. 15) urged by plaintiffs has a 65.81% black majority district and a total population variance of .230%; it splits five counties, including Hinds County, which is divided among three districts. The majority black district in this plan combines portions of the Cities of Jackson and Vicksburg with 15 Delta and part-Delta counties, or segments thereof. Pertinent data on the plan follow:

| District | Total Population | Deviation | % Deviation | Black % |
|---|---|---|---|---|
| 1 | 503,642 | − 486 | − .096 | 25.72 |
| 2 | 504,926 | + 798 | + .158 | 65.81 |
| 3 | 503,762 | − 366 | − .072 | 30.36 |
| 4 | 504,261 | + 133 | + .026 | 33.70 |
| 5 | 504,047 | − 81 | − .016 | 20.33 |

In addition to the two Kirksey plans, the Joint Committee had before it many other plans submitted by various legislators and

Alternate proposals were presented to the reapportionment body which would have avoided the fragmentation and dilution of minority voting strength in the Delta area, and we have received complaints that such alternate proposals were rejected for racially discriminatory reasons. Our own review has revealed that, in fact, reasonable alternatives could be drawn which would avoid the fragmentation and dilution of minority voting strength in the Delta area and the State's submission offers no satisfactory explanation for, or governmental interest in, the rejection of such alternatives.

The adoption of the east-west configuration of the proposed plan, instead of a configuration which recognizes the Delta as a community of interest, suggests to us an unnecessary retrogression in the position of black voters in Mississippi.

Accordingly, we are unable to conclude that the submitted plan meets the requirements of the Act in its treatment of the Delta area. I must, therefore, on behalf of the Attorney General, interpose an objection to Senate Bill No. 2001 pursuant to Section 5 of the Voting Rights Act of 1965.

citizens, including several plans developed by the committee staff on motion of Representative James C. Simpson which resulted in a plan referred to as the "Simpson amendment" (K–26). This plan, urged by AFL–CIO, as amicus curiae, has a total deviation of .2141%, and contains a district (District 2) which combines 15 Delta and part-Delta counties with six eastern rural counties to produce a 53.77% black majority district. Another district (District 4) has a 45.25% black district. The Simpson amendment only splits two rural counties and received considerable support in a floor vote occurring in the state House of Representatives. Miss. House Journal, Extraordinary Sess. 1981, p. 30. This plan is depicted below.

| District | Total Population | Deviation | % Deviation | Black % |
|---|---|---|---|---|
| 1 | 504,671 | + 543 | + .1077 | 25.86 |
| 2 | 504,697 | + 569 | + .1128 | 53.77 |
| 3 | 503,760 | – 368 | – .0729 | 31.23 |
| 4 | 503,893 | – 235 | – .0466 | 45.25 |
| 5 | 503,617 | – 511 | – .1013 | 19.84 |

Other plans considered but rejected by the legislature have not been urged for adoption by this court. The state officials, however, urge implementation as an interim plan of S.B. 2001, the existing 1972 redistricting plan, or a plan to be drawn by the court only slightly modifying either one of the preceding two.

## II.

■ All parties agree that under § 5 and decisional precedent, this court serves only a limited function in congressional redistricting cases. Our task becomes an "unwelcome obligation" to prescribe an interim plan which will be effective merely until a redistricting plan adopted by the state can lawfully be used in its place, i.e., until either the District of Columbia court renders declaratory judgment upholding S.B. 2001 or the Mississippi legislature enacts another redistricting plan which is precleared under § 5. Moreover, notwithstanding a suggestion in *McDaniel v. Sanchez*, 452 U.S. 130, 149, 101 S.Ct. 2224, 2236, 68 L.Ed.2d 724, 739 (1981), that a federal district court should fashion its own plan, this court lacks the time, ability, and record basis to independently create a plan which could be implemented with sufficient promptness to allow the orderly conduct of the 1982 congressional primary and general elections. These limitations thus require us to choose from among the several plans urged for adoption in these proceedings. *Cf. Terrazas v. Clements*, 537 F.Supp. 514, at 520–521 (N.D.Tex. 1982) (three-judge court).

■ Mississippi is precluded by the express terms of § 5 from implementing S.B. 2001 so long as it remains unprecleared. *See Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); *Connor v. Waller*, 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975); *Dotson v. City of Indianola*, 521 F.Supp. 934 (N.D.Miss. 1981) (three-judge court). Section 5, however, does not by its terms prohibit a federal district court from utilizing, on an interim basis, an unprecleared plan. Indeed, it would be a rare case in which a federal court, compelled to devise an interim redistricting plan, would have opportunity to place into effect a plan that had been precleared under § 5. Although circumstances might arise in which a federal court could order, on an interim basis, implementation of an unprecleared legislative plan, we conclude that any action by this court to so order S.B. 2001 into effect would be an injudicious exercise of our equitable remedial power. We base this view on several factors indisputably present in this case.

When S.B. 2001 was submitted, it was specifically objected to by the Attorney

General, who concluded that it violated § 5. Insofar as this court's interim plan-making task is controlled by the Voting Rights Act, we may not substitute our judgment for that of the Attorney General. *Perkins v. Matthews*, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). The proceedings under that Act which the State of Mississippi has instituted in the District Court of the District of Columbia will determine whether S.B. 2001 passes statutory muster for permanent use. It would be both inappropriate and unseemly for us to implement on a temporary basis the plan which those proceedings seek to preclear since we have other plans which will allow us to order temporary redistricting which adequately reconciles state political policy with federal statutory and constitutional standards. For these reasons the court rejects the defendants' suggestion that S.B. 2001 may be used on an interim basis. We expressly refrain from any action which may be viewed as indicating a position on either side of the issues pending in the District Court for the District of Columbia.

 As to the existing 1972 congressional plan, the command of Art. 1, § 2 of the United States Constitution is that representatives be chosen "by the People of the several States." That article permits only those population variances among congressional districts that are "unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." *Kirkpatrick v. Preisler*, 394 U.S. 526, 531, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519, 525 (1969); *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Under admitted facts, the state's existing plan with a 17.6% population variance renders it grossly malapportioned, and since it is readily apparent that this degree of malappor-

tionment is not unavoidable, we declare it to be unconstitutional, and plaintiffs are entitled to summary judgment on that issue as a matter of law.[5] Since plans with substantially lower population variances are available for use, implementation of the 1972 plan, even on an interim basis, would be without justification, and defendants' contention that the 1972 plan be used temporarily is not constitutionally permissible.[6] Accordingly, our decision is narrowed to consideration of the two Kirksey plans and the Simpson amendment proposal.

 In determining which plan to place into effect as an interim plan, we must "reconcil[e] the requirements of the Constitution with the goals of state political policy." *Connor v. Finch*, 431 U.S. 407, 414, 97 S.Ct. 1828, 1833, 52 L.Ed.2d 465 (1977). Moreover, *McDaniel, supra*, compels us to consider § 5 criteria. Thus, any plan adopted by this court as a temporary method of ensuring upcoming elections cannot violate Art. 1, § 2, the fourteenth amendment, or the Voting Rights Act. In particular, such a plan must satisfy the one person, one vote rule and avoid any dilution of minority voting strength. The three plans before us comply with these federal considerations and no tenable argument could otherwise be made. Since federal standards are met, we must now analyze each plan in light of the state's political policies.

We are guided by the Supreme Court's recent decision in *Upham v. Seamon*, —— U.S. ——, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982). In *Upham*, the Court clearly held that, in fashioning an interim reapportionment order, a district court must adhere to the state's political policies except to the extent such policies are violative of either the Constitution or the Voting Rights Act. *See also, White v. Weiser*, 412 U.S. 783, 795,

---

5. *See Kirkpatrick, supra* (invalidating plan with variance of 5.97%) and *Wells v. Rockefeller*, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969) (variance of 13.1% invalid).

6. This is not a case such as *Wells, supra*, and *Kilgarlin v. Hill*, 386 U.S. 120, 87 S.Ct. 820, 17

L.Ed.2d 771 (1967), wherein the courts were required, because of exigent circumstances, to implement malapportioned redistricting plans. In the case sub judice, plans with much lower population variance are readily available.

93 S.Ct. 2348, 2354–2355, 37 L.Ed.2d 335, 346 (1973). As adduced at trial, the state's primary political policies reflected in the passage of S.B. 2001 may be summarized as follows: (1) minimal change from 1972 district lines; (2) least possible population deviation; (3) preservation of the electoral base of incumbent congressmen; and (4) establishment of two districts with 40% or better black population. As to the latter policy, the majority of the Joint Committee and legislature subscribed to the belief that a plan with two minority districts containing at least 40% black population was preferable to a plan that sacrificed two such "high impact" minority districts for one district with a significant black majority. The prevailing legislative view was that in order to ensure a congressman's responsiveness to the needs and interests of black citizens, the district should be at least 40% black whenever possible; any lesser percentage, in its view, would likely result in insensitivity to the black constituency.

■ In determining the validity vel non of these state policies, we note the Attorney General's conclusion that the state's action in drawing lines for Districts 1, 2 and 3 from east to west violated § 5 by unlawfully diluting black voting strength. Since the validity of that determination lies at the heart of the proceedings now pending in the District Court of the District of Columbia, we simply accept that decision for the purposes of this ruling without any indication of a view on its merits. No one argues that the second and third policies offend either the Constitution or the Voting Rights Act. As to the last factor, plaintiffs contend only that one 65% black majority district would better serve the interests of blacks than would two 40% or better black population districts since a 65% black district is more likely to assure election of one black congressman. However, we are bound by the legislative preference for two high black impact districts unless that determination violates constitutional or statutory mandates. We emphasize that it is not our function to substitute our judgment for the state's political program in this respect, absent federal invalidity. We find no federal bar to this aspect of the state's political objective.

■ At the outset, we note that neither the Constitution nor the Voting Rights Act requires proportional representation. *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). What is required is that the state deal fairly with its black citizens by avoiding any scheme that has the purpose or effect of unnecessarily minimizing or fragmenting black voting strength. *White v. Regester, supra.* As noted by the District of Columbia Court in *State of Mississippi v. United States*, 490 F.Supp. 569, 582 (D.D.C.1979) (three-judge court), aff'd mem. 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980), in applying § 5 criteria: "No state or political subdivision is required to search for ways to maximize the number of black voting age population districts. Likewise, no racial group has a constitutional or statutory right to an apportionment structure designed to maximize its political strength." Moreover, the Fifth Circuit has recognized that "the realities of partisan politics may enable a minority in some circumstances to exact more political concessions by swinging its vote to one of two candidates whose majority-race following is approximately equal than it could by electing a candidate of his own identity." *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1160 (5 Cir. 1981). And "[a] court-ordered racial gerrymander which would assure that blacks form a sizeable electoral majority in a single district may not be nearly as effective a guarantee of access as the creation of two or more districts with substantial black voter populations such that all candidates in those districts must be responsive to the needs and aspirations of the black electorate." *United States v. Board of Supervisors of Forrest County*, 571 F.2d 951, 956 (5 Cir. 1978).

Since the establishment of a "safe" minority seat is not a federal prerequisite of a reapportionment plan, *Wyche, supra,* at 1161, we conclude that the state's policy of favoring 40% or better black population districts was legitimate.

■ A consideration of these legitimate state political policies compels us to adopt, as an interim redistricting plan, the Simpson amendment. The Kirksey plans are repugnant to valid state policies inasmuch as they erode the electoral bases of incumbent congressmen in Districts 2 and 4, contain a larger population variance than the Simpson amendment, and disregard the state's policy of creating two high black impact districts. Moreover, these plans represent an obvious racial gerrymander by running a line from District 2 partially into metropolitan Hinds County and the City of Jackson solely to include a large and overwhelming black population corridor having little in common with the rest of what is essentially a rural district.

■ The Simpson amendment, on the other hand, more nearly satisfies the state's criteria by: (1) preserving constituencies of incumbents; (2) maintaining a population deviation of only .2141%; and (3) creating two 40% or better black districts. In addition, the Simpson amendment accords with racial fairness by including a majority black district of 53.77% centered in the Delta area. Plaintiffs challenge that the Simpson amendment or any other plan without a 65% or better black majority district violates the § 5 standard against retrogression of minority voting strength, relying upon *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). We reject this argument which is based upon the premise that the correct benchmark for measuring retrogression is former District 3, as it existed in the 1956 plan, and containing 11 Delta counties having a 65.51% black majority under 1960 census figures. Laying aside the state's position that retrogression should be determined by comparison with

the 1972 plan, it is clear that since the Voting Rights Act became effective on November 1, 1964, retrogression must be determined in accordance with district lines existing no earlier than that date. The plan then in effect, i.e., the 1962 plan, contained the same Delta counties as the 1956 plan, combined with 13 other counties to form old District 2, which then had a 59.29% black majority population. Of course, if the district lines in effect on November 1, 1964, had never been changed, § 5 retrogression could not be implicated, even if there was a reduction in the percentage of blacks residing in former District 2. Computations show that, under 1980 census figures, the formerly 59.29% black majority district is now comprised of only 48.09% black population. Thus, the Simpson amendment with a 53.77% majority district represents an augmentation, rather than diminution, of black voting strength.

Other significant advantages inherent in the Simpson amendment are that it splits only two sparsely settled counties along established precinct lines, preserves a high degree of community of interest in all five districts, including the black majority District 2 which is chiefly an agricultural area, and satisfies concepts of contiguity and compactness. It is equitable that these considerations be taken into account in choosing a plan. We therefore find that the Simpson amendment most nearly satisfies constitutional and statutory constraints while reconciling state political policy, and direct it be used by the State of Mississippi pending preclearance of a statutorily permissible plan.

Accordingly, the court hereby establishes congressional districts for primary and general elections for 1982, and thereafter until a plan is precleared by the State under § 5 of the Voting Rights Act, as follows:

District No. 1 shall consist of the following counties and parts thereof: DeSoto, Tate, Panola, Tallahatchie (all except the precincts of Phillip, Leverette and Cascilla), Marshall, Lafayette, Yalobusha, Grenada,

Calhoun, Benton, Tippah, Union, Pontotoc, Chickasaw, Alcorn, Tishomingo, Prentiss, Lee, Itawamba and Monroe.

District No. 2 shall consist of the following counties and parts thereof: Tunica, Coahoma, Quitman, Bolivar, Washington, Sunflower, Tallahatchie (precincts of Phillip, Leverette and Cascilla), Leflore, Carroll, Montgomery, Webster, Choctaw, Attala, Leake, Madison, Holmes, Humphreys, Yazoo, Sharkey, Issaquena and Warren.

District No. 3 shall consist of the following counties and parts thereof: Clay, Oktibbeha, Lowndes, Winston, Noxubee, Neshoba, Kemper, Rankin, Scott, Newton, Lauderdale, Simpson (all except the precincts of Harrisville, Pearl, Fork Church and Bridgeport), Smith, Jasper, Clarke and Jones.

District No. 4 shall consist of the following counties and parts thereof: Hinds, Claiborne, Copiah, Jefferson, Adams, Franklin, Lincoln, Lawrence, Jefferson Davis, Wilkinson, Amite, Pike, Walthall, Marion, Simpson (precincts of Harrisville, Pearl, Fork Church and Bridgeport).

District No. 5 shall consist of the following counties: Covington, Wayne, Lamar, Forrest, Perry, Greene, Pearl River, Stone, George, Hancock, Harrison and Jackson.

The boundaries of all counties and precincts mentioned above shall be such boundaries as they existed on July 1, 1981. A map depicting the aforesaid plan is appended to this opinion.

Furthermore, the court, after considering the time requirements for candidate qualification and campaigning, and to prepare for the orderly conduct of the 1982 congressional primary and general elections, orders into effect the following schedule:

| | |
|---|---|
| July 13, 1983 at 6 p. m. | Deadline for candidate qualification for primaries |
| August 17, 1982 | First Primary |
| August 31, 1983 | Second Primary |
| September 14, 1982 at 6 p. m. | Deadline for independent candidate qualification |
| November 2, 1982 | General election. |

Our order shall also specify further election procedures applicable to the 1982 congressional primary and general elections.

APPENDIX

COURT-ORDERED INTERIM CONGRESSIONAL REDISTRICTING PLAN